# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2587

_____

Claudia Fercello,

    Plaintiff-Appellant,

v.

County of Ramsey,

    Defendant-Appellee.

              Appeal from the United States
District Court for the
District of Minnesota.

_____

Submitted: May 12, 2010
Filed: July 29, 2010

_____

Before BYE, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

This case concerns the district court's[1] grant of summary judgment in Appellant Claudia Fercello's retaliation claim against Ramsey County, her former employer, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the Minnesota Human Rights Act, Minn. Stat. § 363A.15.[2] Fercello challenges the district court's ruling on a number of grounds. We affirm.

_____

[1] The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2] These claims are governed by the same standards. Hervey v. County of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008).

# I. Background

The facts of this case arose out of Fercello's employment with the Ramsey County Community Corrections Department ("the Department"). Since April 2003, the Department has been under the direction of Carol Roberts. Within the Department there are a number of divisions, each of which is headed by a deputy director. One of those divisions is the Administrative Services Division ("the Division"). In December 2004, Roberts hired Lee Palmer as the deputy director of the Division.

In March 2005, Palmer hired Fercello to fill the position of "Planning and Evaluation Analyst," a probationary position that could become permanent after one year. Upon hiring her, Palmer put Fercello's name and phone number on the manager phone list and appointed her to serve on the Division Management Team with Sally Ruvelson, Gale Burke, and Connie Nowacki, other Division employees. Palmer, as well as other supervisors, referred to Fercello as "Manager of Grants and Contracts."

On Saturday, April 30, 2005, Fercello reported to Roberts that Palmer had sexually harassed her prior to and during her employment with the Division. She informed Roberts that she had told five other people about the harassment prior to reporting it to her. Roberts testified that she was upset to learn that Fercello had waited so long to report the harassment and had disclosed it to others rather than immediately reporting it to her. The following Monday, Roberts began taking the steps necessary to begin an investigation of Palmer's actions. Roberts also met with Palmer and informed him that he was prohibited from making decisions in the Division, holding staff meetings, and having any contact with Fercello. Roberts informed Fercello that she was not required to have any contact with Palmer.

An investigation of Palmer's alleged harassment began on May 3, 2005. During the course of the investigation, Roberts permitted Palmer to continue working at the Division. However, Roberts made an effort to accommodate Fercello's concerns

with regard to Palmer. Despite this, Fercello continued to express to Roberts her anxiety over coming into contact with Palmer. Roberts responded by reassuring Fercello that she had restricted Palmer as much as possible, only allowing him to work certain hours and use certain exits. She also offered to put Fercello in contact with Human Resources ("HR") to discuss her concerns further, an offer on which Fercello did not follow through.

The Department's investigation concluded on June 16, 2005. Around the same time, Roberts limited the people attending the Management Team meetings to senior management employees. Thus, Fercello, Ruvelson, Burke, and Nowacki, who were not senior managers, all stopped receiving invitations to the meetings. Fercello testified that she did not attribute this to her harassment report.

On July 5, 2005, Roberts informed Fercello that Palmer would be terminated, but that she was allowing him to stay with the Division for six months while he found another job. Roberts stated that it was a compassionate decision; she did not want to ruin Palmer financially. The following day, Fercello emailed Roberts, stating that she was "stunned" by this decision. In response to Fercello's concerns, Roberts told Fercello that she could arrange to find Fercello a different office. After Fercello told Roberts that this solution was unacceptable, Roberts met with Fercello to tell her that she had misspoke and "really meant that we would move Lee Palmer's office or Lee out of the office." Fercello recalls Roberts being frustrated and angry during this meeting. At the end of the meeting, however, Roberts told Fercello that Fercello had correctly handled the matter after bringing it to Roberts's attention and that the report would not impact her future with the Division. Shortly after this meeting, Palmer tendered a letter of resignation. He left the Division on August 30, 2005.

In early August, prior to Palmer's departure, Roberts replaced Palmer with Ruvelson, making Ruvelson Fercello's direct supervisor. Fercello argues that after Palmer left the Division, she experienced a hostile attitude from Roberts and

Ruvelson. She claims that during staff meetings, Roberts and Ruvelson would ignore her ideas, interrupt her, and roll their eyes at her. Other employees noticed this behavior as well.

While employed at the Division, Fercello volunteered with the County's specialty courts. During the course of that work, a deputy director expressed concern to Roberts that Fercello was taking positions contrary to the Department during specialty court meetings. In a meeting to address this concern, Roberts told Fercello, "if you intend to stay here, you will have to be part of the team . . . and I hope you do." After contacting a supervising judge regarding Fercello's alleged conduct, Roberts learned that Fercello had not acted inappropriately and allowed Fercello to continue her volunteer work without further interruption.

During the course of Fercello's employment with the Division, there were a number of changes with regard to her parking situation. While reporting to Palmer, Fercello did not have a designated parking spot. Roberts testified that deputy directors, assistant directors, and directors have designated parking spots, but everyone else "works it out" based on seniority. Despite this, when Ruvelson became Fercello's supervisor, she secured a parking spot for Fercello near the Adult Detention Center ("ADC"), along with a number of other employees. After Fercello complained that this parking spot was too secluded and that she might encounter Palmer, Roberts promised to secure a better parking spot "to enhance [Fercello's] safety and sense of wellbeing." Fercello used this new parking spot until the end of 2005, at which point she resumed parking behind the ADC because there had not been an incident with Palmer. At no point did the County take away this designated parking spot.

Fercello also claims that Ruvelson asked her to log her time differently and more thoroughly than other employees. In late August 2005, Ruvelson sent an email to Nowacki, Burke, and Fercello asking them to maintain time sheets so that Ruvelson could become more familiar with their work schedules and gain a better understanding

of how they spent their time. Michael Guevara and Julie Jordan, non-manager "trainers," were not asked to track their time. Burke described the time-tracking requirement as "quite rigid," "like almost every hour of our day keeping this daily log."

In Fall 2005, Ruvelson established an "Action Team" and invited Fercello to be part of it. After several meetings, Ruvelson stopped inviting Fercello. Fercello's name was also removed from the manager email list around this time. Ruvelson stated that she did this because Fercello viewed the Action Team as a burden to her already busy schedule. This position is supported by an email in which Fercello complained about being over-burdened with work, citing the Action Team as one of those burdens.

In October 2005, at the midpoint of Fercello's probationary period, Ruvelson conducted an unofficial review of Fercello. Prior to the review, Ruvelson was concerned about Fercello's workload and had received negative reports concerning Fercello's performance from a number of coworkers and supervisors. As part of the review, Ruvelson solicited "any comments or observations" from employees who had worked with Fercello. Although the review included some positive feedback, it also included a number of negative reports. Based on this information, Ruvelson provided Fercello with an informal performance review, which was not placed in Fercello's file. The review gave Fercello an overall rating of "needs improvement." Despite this low rating, Ruvelson stated that she hoped Fercello would "take this opportunity to plan how to improve [her] performance in order to maximize the likelihood that [she] would be retained as an employee after [her] probationary period end[ed]." Fercello disputed and continues to dispute the grounds for the criticism in the review.

In December 2005, Ruvelson informed Fercello that she had to change offices to make room for an incoming deputy director from another department. When Fercello first joined the Division, she was placed in the only vacant office, which happened to be a windowed office. Of the five people who had windowed offices,

Fercello was the lowest in seniority. Fercello's new office was smaller than her original office and did not have a window.

As Fercello's probationary year came to an end, Roberts decided she would not offer Fercello a permanent position. On Friday, March 10, 2006, nearly eleven months after Fercello's harassment report, Roberts notified Fercello of her decision. The following Monday, however, Roberts revoked Fercello's termination by letter. Roberts testified that she made this change because: (1) she did not feel comfortable terminating Fercello in light of the investigation; and (2) Fercello went through a number of supervisor changes. After deciding to retain Fercello, Roberts appointed Burke as Fercello's supervisor in order to give Fercello a fresh start. Prior to this change, Ruvelson gave Fercello a year-end formal review, rating her "proficient"; one level higher than her informal midterm review.

Burke testified that while she supervised Fercello, Fercello was difficult and frustrating to work with and frequently made mistakes. In September 2006, Burke and Fercello got into an argument over a report they were working on together. Burke prepared a written reprimand, and Ruvelson recommended a verbal reprimand, but Burke delivered neither to Fercello. Burke and Ruvelson also drafted another performance review for Fercello, which noted concerns regarding her work product and workplace demeanor. They never completed this review nor did they deliver it to Fercello.

In November 2006, Fercello resigned her position at the Division, citing work-related stress and a pattern of negative treatment. She then brought a claim under Title VII and the Minnesota Human Rights Act alleging that the County had retaliated against her for reporting Palmer's sexual harassment. The district court granted summary judgment in favor of the County, finding that Fercello was unable to establish a prima facie case and, alternatively, was unable to meet her burden of

showing that the County's proffered reasons for its actions were a pretext for unlawful retaliation. Fercello appeals, and we affirm.

## II. Standard of Review

We review a district court's grant of summary judgment *de novo*. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1117 (8th Cir. 2006). In so doing, we take the facts in the light most favorable to the nonmoving party and grant that party all reasonable inferences. Id. at 1118. While employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment, and there is no separate summary judgment standard for employment discrimination cases. Id. at 1117–18; see also Berg v. Norand Corp., 169 F.3d 1140, 1144 (8th Cir. 1999) ("[T]here is no 'discrimination case exception' to the application of Fed. R. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial."). Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate. Wallace, 442 F.3d at 1118.

## III. Discussion

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). Fercello's retaliation claim is properly analyzed under the McDonnell Douglas[3] framework. Wallace, 442 F.3d at 1119. When analyzing her claim, we keep in mind that the McDonnell Douglas

---

[3]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

framework is just that, a framework. The ultimate question of proof—the burden of which remains on the employee throughout the inquiry—is whether the employer's conduct was motivated by retaliatory intent. Wallace, 442 F.3d at 1119.

Under the McDonnell Douglas framework, an employee has the initial burden of establishing a prima facie case of retaliation. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005). To establish a prima facie case, an employee must show: (1) she engaged in protected conduct; (2) she suffered materially adverse employment action, action that would deter a reasonable employee from making a charge of employment discrimination or harassment; and (3) the materially adverse action was causally linked to the protected conduct. Weger v. City of Ladue, 500 F.3d 710, 726 (8th Cir. 2007).

If an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action. Macias Soto v. Core-Mark Int'l, Inc., 521 F.3d 837, 841 (8th Cir. 2008). The burden then shifts back to the employee to put forth evidence of pretext, the ultimate question being whether a "prohibited reason, rather than the proffered reason, actually motivated the employer's action." Wallace, 442 F.3d at 1120.

With this framework in mind, we consider the County's allegedly retaliatory actions put forth by Fercello on appeal. There is no question that, with respect to her prima facie case, Fercello engaged in protected conduct by reporting Palmer's sexual harassment. See Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 851 (8th Cir. 2005). Our analysis therefore focuses on the second and third requirements of Fercello's prima facie case and whether the County's proffered reasons for its actions are pretextual. While the propriety of summary judgment ultimately rests on the cumulative force of the facts, see Phillips v. Collings, 256 F.3d 843, 849 (8th Cir. 2001), it is proper to consider the allegations individually and then evaluate the

cumulative weight of those allegations, see Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007).

## A. Fercello's Individual Allegations

### 1. Functional Demotion

Fercello first argues that the County reduced her role as "Manager of Grants and Contracts" to a non-managerial position with less privilege and prestige. In support of this argument, she relies on: (1) a change in her parking space location; (2) office relocation to an office without a window; and (3) exclusion from participation in Management Team and Action Team meetings and removal from the management email list. Fercello's claims rest heavily on her argument that there is a question of material fact as to whether she was a manager. We agree that the record demonstrates some confusion as to whether she was a manager and what it means to be a manager as that term is used in the Division. But even accepting that there is a factual dispute as to this matter, the dispute is not material because Fercello's argument fails on other grounds.

The first two parts of Fercello's argument as to functional demotion fail because the actions taken by the County in those instances are not materially adverse employment actions. First, with respect to the parking space, the record shows that Fercello did not have a parking space prior to reporting Palmer's harassment. Only after the report did Ruvelson secure Fercello a parking spot behind the ADC. When Fercello expressed fear of encountering Palmer, Ruvelson secured a spot for her closer to the office. When Fercello no longer feared confrontation with Palmer, she resumed parking behind the ADC. At no point in this sequence of events was Fercello adversely affected. On the contrary, the record shows that Ruvelson did what she reasonably could do to accommodate Fercello's safety concerns. Fercello's parking

space, whether behind the ADC or closer, was a benefit beyond what she received prior to reporting Palmer's harassment. In this situation, the movement of that space does not constitute materially adverse employment action.

Second, Fercello's office relocation, particularly in light of her seniority, is not materially adverse employment action because it is the kind of annoyance or petty slight that we have held does not constitute actionable harm. See Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007) ("[Plaintiff's] new work space may not have been as desirable as his previous quarters . . . but Title VII does not protect employees 'from those petty slights or minor annoyances that often take place at work and that all employees experience.'") (quoting White, 548 U.S. at 68); see also Guimaraes v. NORS, No. 09-12569, 2010 WL 529296, at *4 (11th Cir. Feb. 16, 2010) (unpublished per curiam) ("[M]ovement of [plaintiff] to a cubical farther away from other employees was not adverse employment action."). Fercello has offered no evidence that the relocation of her office rendered her unable to complete her duties or that it otherwise interfered with her employment to an extent that would deter a reasonable person from making a harassment claim. Her office relocation was not materially adverse employment action.

Unlike Fercello's first two claims, exclusion from workplace meetings and management email lists could be materially adverse employment action, particularly when those meetings or emails could contribute to an employee's professional advancement. See White, 548 U.S. at 69. But even assuming that exclusion from these meetings and emails constituted materially adverse employment action, and assuming that Fercello has otherwise satisfied her prima facie burden, the County has offered non-discriminatory reasons for the exclusion. With respect to the Management Team, the record illustrates that the Division sought to limit those

-10-

meetings to senior management. Along with Fercello, Ruvelson, Burke,[4] and Nowacki all stopped receiving invitations. These employees were at or above Fercello's level in the Division hierarchy. As for the Action Team meetings and management emails, the record shows that Ruvelson stopped including Fercello in meetings and email correspondence because Fercello had complained about being overburdened and viewed the Action Team as contributing to that burden. Fercello has not pointed to any evidence that an illegal reason, rather than these proffered reasons, motivated her exclusion from the meetings and management emails. See Dixon v. Pulaski County Special Sch. Dist., 578 F.3d 862, 868–69 (8th Cir. 2009) (employee must provide evidence that the proffered explanation was a pretext for unlawful discrimination). For this and the above-discussed reasons, these claims are not evidence of retaliation.

### 2. Negative Performance Reviews and "Papering" of Fercello's File

Fercello next argues that the district court erred in finding that her negative performance reviews did not constitute retaliation. There are two reviews at issue: (1) the December 2005 informal review; and (2) the September 2006 proposed performance review.[5] These reviews do not support Fercello's prima facie case.

Fercello relies primarily on the contents of her informal review. Even if we assume that this review constituted materially adverse employment action, a reasonable jury could not find that it was causally related to Fercello's harassment

---

[4]Although Burke testified that she was removed from the Management Team, Fercello testified that it was her recollection that Burke continued to attend the meetings. Assuming that this was the case, the fact remains that at least two other people—Ruvelson and Nowacki—were no longer invited to the meetings.

[5]Fercello also received a formal year-end review in June 2006. She does not seriously contend that this review constituted retaliation. Even if she did, for the reasons discussed in this section, we disagree.

report. Fercello reported the harassment to Roberts on April 30, 2005. The informal review began around October 20, 2005 when Ruvelson requested comments on Fercello's performance from other employees. This leaves a gap of nearly six months between Fercello's protected activity and the alleged adverse employment action. This passage of time has two consequences: it weakens the inference of causation, see Sims v. Sauer-Sundstrand Co., 130 F.3d 341, 343 (8th Cir. 1997), and it eliminates Fercello's ability to prove causation based on temporal proximity alone, see Recio v. Creighton Univ., 521 F.3d 934, 941 (8th Cir. 2008) (six months not close enough to raise inference of causation); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (a two-week interval is sufficient to create an inference of causation based on temporal proximity, "but barely so"). Fercello must therefore look to other indicators of causation, and do so in light of a significant time gap.

Fercello first seeks to show causation by arguing that Ruvelson targeted her by seeking out negative reports when compiling her informal review. The record does not support this. Rather, Ruvelson's email requested "*any* comments or observations." Nothing but speculation could lead a jury to conclude that this request sought criticism to the exclusion of positive feedback.

Fercello also argues that the informal review was one-sided and over-emphasized negative reports. Again, there is no evidentiary support for this argument. The review noted areas in which Fercello was "creative and enthusiastic," "extremely efficient and helpful," and "very articulate speaking in groups," as well areas in which she fell short. To the extent that the informal review contained negative comments, the record shows that there was ample support for those comments. Testimony from Fercello's coworkers and supervisors, almost all of whom were not shown to have knowledge of the harassment report, reveals an extensive history of performance issues and personality conflicts. This testimony renders Fercello unable to create a question of material fact as to causation based on negative reviews. See Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 645 (8th Cir. 2009) (absence of knowledge of

prior protected activity eliminates causation); <u>Jackson v. St. Joseph State Hosp.</u>, 840 F.2d 1387, 1391 (8th Cir. 1988) (Title VII does not insulate an employee from the consequences of inadequate work performance).

Despite the fact that there was support for much of the review's criticism, Fercello offers a detailed analysis of the review in an effort to show that some of the criticism was without merit. But even if she is correct, this does not entitle her to a trial on the issue. Absent some evidence of retaliatory motive, we will not second-guess an employer's judgment of an employee's performance. <u>See</u> <u>Gilbert</u>, 495 F.3d at 916 ("[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom and fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.") (quotation omitted). Given the absence of facts demonstrating a retaliatory motive, particularly in light of the detailed history of questionable performance and the absence of temporal proximity, a reasonable jury could not find that the "unfair" or "unsupported" criticisms that Fercello received were the result of unlawful retaliation.

With respect to the proposed performance review, the record shows that it was not completed nor was it delivered to Fercello. These facts strongly militate against a finding that it was materially adverse. <u>See</u> <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (proposed suspension not materially adverse where suspension was not actually served). Further, Fercello has not otherwise identified negative consequences stemming from this proposed review. Without this, the proposed performance review is not evidence of retaliation. <u>See</u> <u>Weger</u>, 500 F.3d at 727.

### 3. Repeated Oral Warnings and Poor Treatment

Fercello next argues that she suffered retaliation in the form of repeated oral warnings and poor treatment by Roberts and Ruvelson. Neither of these claims support a finding of retaliation. As to the alleged oral warnings, there is no evidence that they took place. The only "warning" to which Fercello points is Roberts's statement to Fercello regarding Fercello's work with the specialty courts. After hearing that Fercello had taken positions contrary to the Department, Roberts told Fercello, "if you intend to stay here, you will have to be part of the team . . . and I hope you do."[6] Fercello argues that she understood this statement to be a threat to terminate her employment. Her subjective view is not determinative. Higgins v. Gonzales, 481 F.3d 578, 591 (8th Cir. 2007) ("The standard under Burlington Northern is objective . . . ."). Objectively viewed, Roberts's statement is not a warning or a threat. Roberts identified an issue, investigated it, and ultimately permitted Fercello's volunteer work to continue. Further, there is no evidence that the comment was in any way related to Fercello's harassment report. The only evidence to which the parties point shows that Roberts made the comment in response to concerns by a deputy director about Fercello's conduct at specialty court meetings. There is no evidence to suggest the requisite causal relationship.

Fercello also claims that Roberts and Ruvelson made her feel unwelcome at meetings by rolling their eyes at her, interrupting her, and ignoring her contributions. Although her coworkers confirmed these allegations, these actions do not constitute

---

[6]Although Fercello does not seriously argue the issue, she notes that Roberts requested that she be removed from her position as a specialty court evaluator. The record is clear, however, that Roberts never followed through with this request. Once Roberts determined that Fercello had not acted inappropriately, she permitted her to continue her volunteer work without interruption. Thus, Fercello suffered no adverse employment action. See Weger, 500 F.3d at 727 (employee must allege adverse employment action had "negative impact"). Further, there is no indication that Roberts's initial request was in any way related to Fercello's harassment report.

-14-

actionable retaliation in this case. See White, 548 U.S. at 68 ("Title VII . . . does not set forth 'a general civility code for the American workplace.'") (citation omitted); Higgins, 481 F.3d at 591 ("[Plaintiff] cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs."). Fercello's arguments on this point are particularly weak in light of a record that reveals personality conflicts between Fercello and her coworkers and supervisors.

## 4. Surveillance

Fercello next claims that she suffered retaliation because Ruvelson placed her under "constant surveillance." Although placing an employee under constant surveillance could be evidence of retaliation, see Kim v. Nash Finch Co., 123 F.3d 1046, 1061 (8th Cir. 1997), Fercello has not put forth evidence that the time-tracking procedures were implemented in any part because of her harassment report. To begin with, Ruvelson requested that Fercello track her time nearly four months after Fercello's harassment report, significantly weakening any causal relationship. See Sims, 130 F.3d at 343. Further, the record shows that Burke and Nowacki—employees who Fercello concedes were at her level—were also required to track their time. Cf. Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (employee can prove causation "by showing disparate treatment of fellow employees who engaged in similar conduct"); Robertson v. Fed. Express Corp., No. Civ. 02-4161, 2004 WL 1278929, at *3 (D. Minn. June 5, 2004) (unpublished) ("The most common way for a plaintiff to establish causation is evidence that similarly situated white employees were treated differently."). In fact, Burke testified that the policy was "quite rigid" and that it was "like almost every hour of our day keeping this daily log." Fercello seeks to create a question of fact as to causation by arguing that Ruvelson did not require other employees to track their time. This argument fails because the record reveals that the other employees Fercello identifies had different positions than Fercello, Burke, and Nowacki; they were not similarly situated. See Putnam v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003) (claims of differential treatment require

evidence that similarly situated employees were treated more favorably). Fercello has thus failed to offer sufficient evidence that Ruvelson imposed the time-tracking requirements upon her because of her harassment report.

### 5. Discharge at the Close of Probationary Period

Fercello's next claim is that she suffered retaliation by being discharged at the end of her probationary period, even though she was reinstated the next business day. The issue of whether this reinstatement "cures" the discharge so as to render it not materially adverse is not an easy one. Although it is difficult to articulate the concrete impact on Fercello's employment, it is also difficult to say as a matter of law that such a "shot across the bow," as she refers to it, would not dissuade a reasonable employee from reporting sexual harassment. See Littleton, 568 F.3d at 644 (exploring a similar situation and noting the difficulty of the question). We need not address this issue, however, as the record does not show a causal link between Fercello's discharge and her protected conduct, and Fercello has failed to show that the County's proffered reason for its action was a pretext for unlawful retaliation.

As has been the case with many of Fercello's claims, her initial discharge took place well after her harassment claim, and Fercello does not otherwise show evidence of causation. Further, even assuming that Fercello satisfied her prima facie burden, she has not shown that the County's proffered explanation for initially discharging her was a pretext for unlawful discrimination. Roberts testified that Fercello did not pass her probationary period because Fercello was argumentative and difficult to work with. The testimony of Fercello's coworkers reflects as much. The only evidence that Fercello puts forth to dispute this is evidence that she completed a greater volume of work than her predecessor and testimony from some of her coworkers who believed that she worked long hours. But this does not rebut Ruvelson's stated reason for terminating Fercello, as someone could work hard and still be difficult to work with. And even if Roberts's overall assessment of Fercello was incorrect, this does not

-16-

entitle Fercello to a judgment on the pretext issue, particularly because there is no evidence that Roberts's assessment of Fercello was not honest. See Dixon, 578 F.3d at 869 ("[T]he essential question is not whether [the plaintiff] was actually unqualified for the position; it is whether the School District *honestly believed* that she was unqualified.") (emphasis added). "'[P]retext' . . . often must be read as shorthand for indicating that a defendant's proffered discriminatory explanation for adverse employment action is a pretext for *unlawful* discrimination, not that it is merely false in some way." Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1017 (8th Cir. 2005). Fercello has not put forth evidence that this was the case and therefore cannot show pretext.

## 6. Constructive Discharge

Fercello's final claim is that the County retaliated against her by way of constructive discharge. "Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation." West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995). The bar to relief, however, is high. O'Brien v. Dep't of Ag., 532 F.3d 805, 810–11 (8th Cir. 2008). "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 616 (8th Cir. 2007). An employee can meet this second prong through direct evidence or through evidence that "the employer . . . could have reasonably foreseen that the employee would [quit] as a result of its actions." Wright v. Rolette County, 417 F.3d 879, 886 (8th Cir. 2005) (quotation omitted). Fercello has failed to meet this burden.

In support of her claim, Fercello relies on the aggregate effect of the alleged adverse actions she claims to have suffered. Even if we were to find that Fercello established that the conditions were sufficiently intolerable, there is no evidence that

the County intended to force Fercello to quit or that it could have reasonably foreseen that she would do so. The record indicates that the County provided Fercello with a parking space typically not given to employees of her seniority, gave her time off when she requested it, suggested that she speak with HR and the County's FMLA specialist about her problems, provided her with an alternative work schedule to accommodate an illness, and sought to understand the problems that she had with her work load. These accommodations show an intent to maintain an employment relationship with Fercello, not force her to quit. See Devin, 491 F.3d at 790 (employer's willingness to discuss options with employee "undercuts any claim of constructive discharge"); EEOC v. City of Independence, Mo., 471 F.3d 891, 896 (8th Cir. 2006) (same). Further, after Roberts initially discharged Fercello following her probationary period, she rehired her because she thought that Fercello may have had a hard time dealing with the harassment investigation and the numerous supervisor changes. This too is inconsistent with the requisite intent. Cf. Anda v. Wickes Furniture Co., Inc., 517 F.3d 526, 534 (8th Cir. 2008) (employer seeking to persuade employee not to quit supports finding that employer did not intend to force employee to quit). Rather than intentionally rendering Fercello's work conditions intolerable, the record shows that the County sought to accommodate Fercello at nearly every turn. Fercello has failed to point to any evidence in the record showing that the County intended to force her to quit or reasonably could have foreseen that she would have quit as a result of its actions. Accordingly, she cannot use constructive discharge to show retaliation.

## B. Fercello's Claims in the Aggregate

Fercello also argues that, when taken collectively, the above-discussed actions constitute retaliation. We cannot agree. Although it is proper to consider the cumulative effect of an employer's alleged retaliatory conduct, see Devin, 491 F.3d at 787–88, the evidence in Fercello's case falls short. The record shows that on April 30, 2005, Fercello engaged in protected conduct by reporting Palmer's sexual

harassment. Over the next nineteen months, ending in Fercello's eventual resignation in November 2006, a number of allegedly adverse actions took place. We agree with Fercello that context matters in retaliation cases, see White, 548 U.S. at 68, but the context in this case illustrates a scattered assortment of actions that are either petty, unsubstantiated, or otherwise causally unrelated to Fercello's protected conduct. The record also reveals numerous efforts by the County to remedy conflicts and accommodate Fercello's needs.   Taken as a whole, the actions of the County in this case do not constitute systematic retaliation capable of transforming otherwise lawful conduct into unlawful, retaliatory employment action.

## IV. Conclusion

We affirm the judgment of the district court.

_____