# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1343

_____

| | | |
|---|---|---|
| Kimberli Trierweiler, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of South Dakota. |
| Wells Fargo Bank, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: March 15, 2011
Filed: April 8, 2011

_____

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Kimberli Trierweiler brought this action against her former employer, Wells Fargo Bank (Wells Fargo), alleging that the bank had constructively discharged her in violation of the Pregnancy Discrimination Act, 42 U.S.C. § 2000(e)(k). The district court[1] granted Wells Fargo's motion for summary judgment. Trierweiler appeals, and we affirm.

_____

[1] The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

# I.

Trierweiler began working for Wells Fargo in October 2006 as a teller at the bank's Watertown, South Dakota branch. Upon starting her employment, she received an employee handbook that detailed the company's policies in respect to attendance, absenteeism, and paid time off (PTO). The handbook stressed that regular and dependable attendance was an essential function of the job and that excessive absences were grounds for corrective action, including termination. The handbook also provided several toll free employee resource numbers to contact for assistance concerning accommodations for medical issues, harassment or discrimination, problems with supervisors, and ethics violations.

At the time of Trierweiler's employment, Wells Fargo employees received 20 days, 160 hours, of PTO each year. New employees were eligible to take PTO after a one month waiting period. Based on her October 2006 start date, Trierweiler received a pro rated PTO allotment of two days for 2006. She used all of her PTO time and had an additional four and a half days unpaid absence by the end of the year.

In December 2006, Trierweiler informed her supervisors Jennifer Brown and Mandy Maynard that she was pregnant. Because she had been employed less than a year, and would not reach a year by her July due date, Trierweiler was not eligible for leave under the Family and Medical Leave Act. She was however eligible to take maternity leave under Wells Fargo's short term disability plan. Trierweiler was told that after her maternity leave began, there would be a five day waiting period before her short term disability benefits would kick in. She would have to use PTO in order to be paid for those five days. Trierweiler alleges that she was not told that she could use unpaid time off during the waiting period if she had no PTO remaining when her maternity leave began, although the employee handbook did provide that information. Believing she was required to use PTO time, Trierweiler told Brown and Maynard that she planned to reserve five of her 2007 PTO days to cover the waiting period.

On April 3, 2007, Trierweiler had a formal performance evaluation with Maynard and the branch manager. Maynard rated Trierweiler's performance as meeting or exceeding expectations. There was no discussion at the meeting of any concerns relating to her attendance or PTO use.

Two weeks after her evaluation Brown scheduled a visit with Trierweiler to discuss her attendance. During the first three and a half months of 2007, Trierweiler had incurred eleven and a half days absence, with three additional days scheduled before the end of April. All told this amounted to nearly 120 hours of her 160 hour annual PTO allowance. None of these absences were related to her pregnancy. During the April meeting, Brown says that she gave Trierweiler a verbal warning regarding her frequent absences. Trierweiler acknowledges that she and Brown reviewed her PTO usage at the meeting and that Brown told her that she did not have many days remaining, but she says that it was not a disciplinary meeting.

Trierweiler took another PTO day on May 9 to stay home with a sick child. Supervisor Maynard emailed Human Resources the same day to inquire as to how she should handle Trierweiler's continuing absences. HR advised her to inform Trierweiler that if she had another absence, she would receive a written warning.

Two days later on May 11, Maynard called a meeting with Trierweiler. The parties dispute what occurred at this meeting. According to Trierweiler, Maynard first handed her a complimentary letter from a customer about her service and then "smirked." She told Trierweiler that if she missed one more day of work before the end of the year, she "would be done working there." Trierweiler replied that she would call HR about the matter, and Maynard responded that she was acting on directions from HR. During her deposition, Maynard testified that she had told Trierweiler on May 11 that she would be given a formal warning if she had another absence.

On the next work day which was May 14, Trierweiler saw her doctor for stress and cramping. Trierweiler then left a phone message for Maynard saying that she had a doctor's note for a pregnancy related medical leave for the entire week. Maynard returned the call and left a message. According to Trierweiler, the message said "This isn't going to work, you taking time off." Trierweiler alleges that she understood the message to mean that she no longer had a job. She did not contact Maynard or anyone else at Wells Fargo to inquire about her job status.

While Trierweiler was on the week's medical leave, Maynard sought advice about the situation from HR consultant Lisa Cossette. Cossette in turn sought the advice of an upper level HR consultant. In one email to the upper level consultant, Cossette expressed skepticism about Trierweiler's medical leave, saying that she was unsure what to do if Trierweiler started "having 'pregnancy' related absences all of a sudden . . . . She hasn't had any pregnancy related problems up to this point. Yucky one! But I want to make sure we do the right thing too." They ultimately decided to issue Trierweiler a formal warning for her previous absences, not including the recent medically approved leave, and to contact a Wells Fargo program called Work*Ability* to explore possible temporary accommodations for any current and future pregnancy related leaves. Two days later on the last day of her medical leave, Trierweiler drove through the bank drive through lane, gave a teller her keys, and said that she was done. She then left Maynard a phone message saying that she had dropped off her keys and asking that a teller retrieve her personal items.

Trierweiler brought this action against Wells Fargo for constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k). The district court granted summary judgment to Wells Fargo, concluding that Trierweiler had failed to present sufficient evidence that she had been constructively discharged. Trierweiler appeals.

-4-

## II.

We review a district court's grant of summary judgment de novo, viewing the record and all reasonable inferences in the light most favorable to the nonmoving party. Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 573 (8th Cir. 1997). Although employment discrimination cases are "often fact intensive and dependant on nuance in the workplace, they are not immune from summary judgment." Fercello v. County of Ramsey, 612 F.3d 1069, 1077 (8th Cir. 2010). If there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate. Id.

Trierweiler asserts that after Wells Fargo learned that she was pregnant, her supervisors made impossible attendance demands with the intention of making her quit. To prove a claim of constructive discharge under Title VII, Trierweiler must show that "a reasonable person would have found the conditions of employment intolerable and that [Wells Fargo] either intended to force [her] to resign or could have reasonably foreseen that [she] would do so as a result of its actions." Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1087 (8th Cir. 2010). We have recognized that this is a "substantial burden" as the "bar is quite high" in constructive discharge cases. Id.

In support of her claim for constructive discharge, Trierweiler relies on two statements by her supervisor Maynard. The first occurred at their May 11 meeting. According to Trierweiler, Maynard said at the meeting that if she missed one more day of work before the end of the year, she would be done working there. When Trierweiler asked about going to see HR, Maynard responded that she was receiving her directions from HR. The second statement was made less than a week later, during Trierweiler's first and only pregnancy related leave. Maynard left a phone message for Trierweiler in which she said that she didn't know how her absence was going to work.

Trierweiler asserts that the May 11 meeting and subsequent phone message left her frustrated "over the impossibility of the terms of th[e] attendance mandate." She argues that Maynard's act of telling a pregnant employee as her due date was approaching that she could not miss one more day of work without being fired was a comment that could "only be designed to strongly encourage the employee to quit."

Viewing the facts and all reasonable inferences in the light most favorable to Trierweiler, we cannot say that she suffered any adverse employment action, let alone that she was constructively discharged. The record shows that after she had used the majority of her PTO time during the first three and a half months of the year, her supervisor Brown conducted informal counseling with her. Following additional absences, her direct supervisor Maynard called the meeting for May 11 and allegedly advised her that she could have no more absences. Trierweiler began her first pregnancy related leave the following work day. On that day she received the phone message from Maynard voicing her concern about the leave situation. Trierweiler then chose not to return to work after her medical leave concluded. At most, Trierweiler has shown through the statements by HR consultant Lisa Cossette in her email and by Maynard that she may have experienced "an unpleasant and unprofessional" working environment at Wells Fargo, but a claim for constructive discharge requires proof of "considerably more" than that. See Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002).

Even if we were to find that Trierweiler established that the conditions of her workplace were sufficiently intolerable, she has failed to show that Wells Fargo intended to force her to quit or that it could have reasonably foreseen that she would do so. See Fercello, 612 F.3d at 1083. The record instead reflects that while Trierweiler was on her first pregnancy related leave, her supervisors and HR decided to seek assistance from Wells Fargo's Work*Ability* program to explore possible accommodations for her absences. This shows an intent to maintain an employment

relationship with Trierweiler, not to cause her to quit. See Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 790 (8th Cir. 2007).

We have consistently recognized that an employee is not constructively discharged if she "quits without giving [her] employer a reasonable chance to work out a problem." Brenneman v. Famous Dave's of Am., Inc., 507 F.3d 1139, 1144 (8th Cir. 2007). Trierweiler has presented no evidence to suggest that she made any attempt to work out her concerns with Wells Fargo about maternity leave or Maynard's attendance demands. She never spoke with HR or utilized any of the resource numbers provided in the employee handbook, never asked for clarification of what Maynard had meant during the May 11 meeting or later phone message, and never attempted to return to work after her first and only pregnancy related absence. "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir. 1990). By not even attempting to return to work after her medical leave concluded, Trierweiler acted unreasonably and failed to provide Wells Fargo with the necessary opportunity to remedy the problem she was experiencing.

Viewing the evidence and all reasonable inferences in her favor, we conclude that Trierweiler has failed to show that a reasonable person would have found her working conditions at Wells Fargo to be "intolerable" or that she provided her employer a reasonable opportunity to remedy the situation. Summary judgment is therefore appropriate under these facts. See Brenneman, 507 F.3d at 1144.

Accordingly, the judgment of the district court is affirmed.

_____