# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3186

_____

Gage Elon Hunter,               *
                                   *

        Appellant,        * Appeal from the United States
                                   * District Court for the
                                   * District of Minnesota.
        v.                       *
                                   *

United Parcel Service, Inc.    *
                                   *

        Appellee.         *

_____

Submitted: May 17, 2012
Filed: September 17, 2012

_____

Before LOKEN and BEAM, Circuit Judges, and PERRY,[1] District Judge.

_____

PERRY, District Judge.

      Gage Hunter filed this lawsuit claiming that defendant United Parcel Service, Inc. discriminated against him based on his gender, sexual orientation, and disability when it failed to hire him as a part-time package handler. Hunter

---

     [1]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri, sitting by designation.

appeals the district court's[2] grant of summary judgment in favor of UPS. After reviewing the grant of summary judgment *de novo*, and considering the facts in the light most favorable to Hunter, we affirm. Yon v. Principal Life Ins. Co., 605 F.3d 505, 509-10 (8th Cir. 2010) (standard of review).

## I. BACKGROUND

United Parcel Services, Inc., is a parcel delivery company with facilities nation-wide and internationally. In Minneapolis, UPS receives between 200 and 300 applications monthly for the part-time package handler position, and it hires an average of 40 of those applicants each month. The position requires employees to load up to 1300 packages per hour and lift up to 70 pounds. Although part-time, the position comes with medical benefits and tuition reimbursement. An applicant is required to do two things before being granted an interview: (1) complete the online application and (2) tour a sorting facility to observe the type of labor the position requires.

Interviews for the part-time package handler position last between seven and fifteen minutes. Interviewers focus on whether the candidate is likely to stay with the company because of the expense and frequency of turnover. Interviewers look at the applicant's interest in the benefits package, the applicant's job history, and the applicant's interview responses. Interviewers also routinely ask applicants why they are interested in the position and whether they are able to perform the job functions. After the interview, the interviewer codes the application indicating that the applicant should receive a second interview or one of several pre-established summary conclusions, like "poor interview responses" or "poor job history," to indicate that the applicant should not receive a second interview. The interviewer can only use one code, even if more than one applies.

---

[2]The Honorable Ann Montgomery, United States District Judge for the District of Minnesota.

- 2 -

Gage Hunter was born female, but has identified as male since he was a child. Hunter first submitted an application for employment with UPS in 2006. At the time of his 2006 application, Hunter was presenting himself as female and submitted his application under his birth name, Jessica Axt. He was offered a position, but declined it because he was interested in a position with a different employer. This case arises out of another application Hunter submitted, in 2008, again with the name Jessica Axt, for a part-time package handler position. At that time, Hunter had begun presenting himself as male. Hunter had not yet had any surgical procedures related to gender reassignment, but he had recently begun wearing a "binder" to bind his breasts and had started taking male hormones. Hunter was also receiving social security disability benefits based on a psychological disorder that only allowed him to work part-time.

In March of 2008, a UPS recruiter, David Weinstein, sent Hunter an email about open positions. Weinstein testified that UPS routinely contacts previous applicants to see if they are still interested in working for UPS. Hunter and Weinstein had some conversation via email where Hunter stated that he was having trouble with the online application. Weinstein told Hunter that he could get help with his application when he toured the packaging facility.

On April 2, 2008, Hunter participated in a tour of the packaging facility led by Brad Trendle. Hunter attempted to sign up for an interview time after the tour, but Trendle told Hunter that his name was not on the list. On April 11, 2008 and April 16, 2008, Hunter came back to interview, but he was again told he was not on the interview list. Hunter then explained to Trendle that he was having trouble completing his online application and Trendle adjusted a setting that allowed Hunter to complete the application. On April 23, 2008, the next time Hunter came back, he was granted an interview.

Trendle interviewed Hunter for eight minutes. In addition to the binder used to bind his breasts, Hunter wore clothing he had purchased from the men's department: a brown long sleeved, button down shirt, brown pants, and dress shoes. Hunter also had a short haircut. Hunter told Trendle he was interested in the position and would like to work for UPS. Trendle asked Hunter why he wanted to work part-time, and Hunter said he could only work part-time because he received social security. Trendle showed Hunter the job description and asked Hunter whether he would be able to perform the job functions. Hunter indicated that he could perform the job functions. Trendle also asked Hunter whether he was interested in the benefits the job offered, i.e., medical benefits and tuition reimbursement. Hunter indicated that he already received social security disability benefits.

At the end of the interview, another individual came in and whispered something in Trendle's ear, then Trendle told Hunter that UPS was not hiring. Trendle coded Hunter's application as "poor interview answers." Trendle testified that Hunter's job history was also problematic. Hunter's application showed he had four jobs in less than three years. One of the positions was a job as a package handler at Federal Express, which Hunter quit after one year to take a lesser paying job. Trendle testified that he thought the history suggested that Hunter did not like this kind of work. Hunter testified that he left FedEx for a better paying job, but when that job fell through he was forced to take a lesser paying job.

On June 26, 2008, Hunter emailed Weinstein saying he was still interested in working for UPS, he had gone on a tour of the packaging facility, and Trendle told him UPS was not hiring. Weinstein responded with inquiries about Hunter's location and hour preferences; he then set Hunter up for another tour on July 10, 2008. At the end of that tour, Hunter was told he could not sign up for another interview because he had already interviewed.

The evidence shows that, during March, April, and May 2008, Trendle hired several applicants with sporadic or no job history. For example, he hired a man who had held only one job for two months before applying to UPS, a man who had held five jobs in four years, a man who had held six jobs in less than four years, a woman who held three jobs in a little over a year, and three men with no job history. The three applicants with no job history were all students, but two other students with no job history were not hired and their rejections were coded as "poor job history." UPS also hired an applicant who held a job as a package handler at a competitor for just three months, but it did not hire a different applicant who held a job as a package handler at a competitor for six months. The applicant who was hired, though, was not interviewed by Trendle and stated on his application that he quit the previous job because there was not enough work.

Hunter asserts that UPS discriminated against him based on his gender, sexual orientation, and disability, in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et. seq*.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; and the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq*. On July 22, 2011, the district court granted UPS's motion for summary judgment. Hunter then requested the district court's permission to bring a motion for reconsideration, and, on August 30, 2011, the court entered an Order denying Hunter's request.[3]

---

[3]UPS's argument that this appeal was not timely filed need not be addressed in detail. See DuBose v. Kelly, 187 F.3d 999, 1002 (8th Cir. 1999) (holding that although a motion to reconsider is not listed by name in Federal Rule of Appellate Procedure 4(a)(4), it is the functional equivalent of a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), and it tolls the time for filing an appeal).

## II.   DISCUSSION

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . or otherwise to discriminate against any individual . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Gender stereotyping can violate Title VII when it influences employment decisions.  Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989); see also Lewis v. Heartland Inns of America, L.L.C., 591 F.3d 1033, 1038 (8th Cir. 2010).  The Minnesota Human Rights Act explicitly forbids employment discrimination based on sexual orientation.  Minn. Stat. § 363A.08, subd. 2(1), (3) (2004).  Minnesota law defines sexual orientation to include "having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness."  Minn. Stat. § 363A.03, subd. 44.

When interpreting cases under the MHRA, Minnesota courts give weight to federal court interpretations of Title VII claims because of the substantial similarities between the statutes.  Wayne v. MasterShield, Inc., 597 N.W.2d 917, 921 (Minn. Ct. App. 1999).  The Minnesota Supreme Court has adopted the familiar test found in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to analyze MHRA claims where, as here, the claimant relies on indirect evidence of discrimination.  Sigurdson v. Isanti Cty., 386 N.W.2d 715, 719-20 (Minn. 1986).

The McDonnell Douglas framework has three stages.  In the first stage, Hunter must establish a prima facie case of discrimination.  Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1077-78 (8th Cir. 2010).  To establish a prima facie case of discriminatory failure to hire, Hunter must prove:  (1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected; and, (4) after he was rejected, UPS continued to seek applicants with Hunter's qualifications.  Harrison v. United Auto Grp., 492 F.3d 972, 974 (8th Cir. 2007).  If Hunter succeeds at the first stage,

UPS then bears the burden of providing a legitimate, non-discriminatory basis for the alleged adverse action. Fercello, 612 F.3d at 1077-78. If UPS meets its burden, in the third stage, Hunter must show that a genuine issue of fact exists as to whether UPS's stated reason for the adverse action is pretextual. Id.

### A. Gender Non-Conformity

Hunter's primary argument on appeal is that he was discriminated against based on his non-conformity to gender stereotypes or his being perceived as transgendered. The district court found that Hunter had failed to establish a prima facie case of discrimination because there was no evidence that Trendle knew Hunter was transgendered or perceived him as transgendered and discriminated against him on that basis. We agree.

Hunter argues that plaintiffs alleging discrimination should not be required to prove an interviewer's subjective awareness of a protected class. He claims, citing Goins v. West Grp., 635 N.W.2d 717, 724 (Minn. 2001), that the Minnesota Supreme Court has held that a plaintiff need merely allege having a nontraditional self-image to successfully make out the first element of a prima facie case, i.e., that he or she was a member of a protected class. This is not a fair reading of the case. In Goins, the employer was informed by its female employees that the claimant, who was biologically male, had used the female restroom, so the employer enforced a policy that all employees were required to use restrooms according to their biological gender. Id. at 721. In that case, the employer knew the claimant was biologically male and identified as female, if not based on the initial complaint from its female employees, then based on a conversation directly with the claimant. Id. As a general matter, an employee must produce some evidence of a connection between the protected status and the adverse employment action. For protected classes that are not readily apparent, showing the needed connection would typically require showing that the employer was

- 7 -

aware. For example, in a disability discrimination case, the employee must prove that the employer knew of the employee's disability or perceived him or her as disabled. See Raytheon Co. v. Hernandez, 540 U.S. 44, 55 n. 7 (2003) (noting that if an employer "were truly unaware that such a disability existed, it would be impossible for her hiring decision to have been based, even in part, on respondent's disability . . .").

In some cases, the claimant's protected status is obvious and it is reasonable to assume the employer was aware of such status, for example, if a woman is nine months pregnant with a protruding stomach she makes no attempt to conceal, awareness can be presumed. See Geraci v. Moody-Tottrup, Int'l, Inc. 82 F.3d 578, 581-82 (3rd Cir. 1996). But here the evidence does not show that it was obvious that Hunter was born female and attempting to deviate from his traditional gender stereotypes. In cases of discrimination based on a protected status that is not necessarily obvious, as is sometimes the case with religion or national origin, the employee must show that the employer was sufficiently aware of the employee's status to have been capable of discriminating based on it. Reed v. Great Lakes Cos., 330 F.3d 931, 934 (7th Cir. 2003); Lubetsky v. Applied Card Systems, Inc., 296 F.3d 1301, 1306 (11th Cir. 2002). In Equal Emp't. Opportunity Comm'n v. Trans State Airlines, 462 F.3d 987, 992-93 (8th Cir. 2006), we noted that when there is no evidence that an employer was informed of a claimant's protected status or commented on it and the employer testifies that the status was not considered, an inference that the employer both assumed the status and considered it in the employment decision is tenuous.

At the time of the interview, Hunter had not undergone any surgical procedures related to gender reassignment. There is no evidence that he had any facial hair, that he told Trendle he identified as male or transgendered, or that Trendle engaged in any dialogue or action that suggested he was aware of Hunter's protected status. Instead, the evidence shows that Hunter applied to UPS

- 8 -

using the name Jessica Axt, yet came to the interview with his breasts bound, a short haircut, and wearing clothing and shoes he purchased from the men's department. None of these facts, even when taken together and even when viewed in the light most favorable to Hunter, are exclusive to transgendered or gender non-conforming individuals. Many fashion trends have called for women to wear short haircuts, men's clothes, or men's shoes. To hang a rule of law on fashions that may change with the times would create an unworkable rule. Although there is no particular type of evidence that is required to establish a prima facie case of gender or sexual orientation discrimination, some evidence that Trendle was aware of Hunter's protected status was required. The district judge applied the correct test: whether UPS refused to hire Hunter *because of* his gender or sexual orientation. See Harrison, 492 F.3d at 975. Ultimately, Hunter failed to establish that Trendle knew Hunter was transgendered or gender non-conforming; he therefore cannot prove that UPS discriminated against him because of a protected status of which it was unaware.

## B. Pretext

Even if a jury could find that Trendle inferred that Hunter was transgendered or gender non-conforming at the time of the interview, UPS provided a legitimate non-discriminatory reason for not hiring Hunter. UPS contends both that Hunter gave poor interview responses and that he had a poor job history. Specifically, Trendle asked Hunter whether he was interested in the benefits the job offered, i.e., medical benefits and tuition reimbursement. Hunter testified that he told Trendle he already received social security disability benefits. As to job history, Hunter's job application showed he had four jobs in less than three years. One of the positions was a job as a package handler at FedEx, which Hunter quit after one year and then took a lesser paying job. Hunter testified that he left FedEx for a better paying job, which fell through, so he was forced to take the lesser paying job, but there is no evidence that anyone at UPS was made aware

of that explanation, and Trendle testified that he thought the history suggested Hunter did not like being a package handler. UPS articulated legitimate, non-discriminatory reasons for not hiring Hunter which would have satisfied its burden at the second stage of the McDonald Douglas analysis on Hunter's gender discrimination claim, sexual orientation discrimination claim, and even the faintly discussed disability discrimination claim. The burden then shifts to Hunter to prove those reasons were a pretext for discrimination.

Hunter argues that a genuine issue of fact exists as to whether UPS's stated reasons for the adverse action was pretextual because he was turned away twice when he came in for interviews he had scheduled, Trendle falsely told him UPS was not hiring, the objective criteria of job history was not the initial reason given for not hiring him, the code Trendle used to eliminate him from consideration for the job was a subjective criteria, and the objective criteria of job history was not evenly applied to all applicants. We disagree.

Hunter was turned away for the first two scheduled interviews because he had not completed an online application, which is required before an applicant can receive an interview for the part-time package handler position. The very next time Hunter came to UPS after filling out his online application, he was granted an interview. This is not evidence of discrimination.

Trendle's having lied to Hunter is likewise insufficient evidence to create a genuine issue of material fact in this case. When an employer's stated reason for not hiring an applicant or firing an employee is false, an inference of discrimination may potentially be created. Loeb v. Best Buy Co., Inc., 537 F.3d 867, 873 (8th Cir. 2008). Although Trendle lied to Hunter at the interview, the false reason was not noted on any of the internal UPS documents, nor has UPS ever argued that it rejected Hunter because it was not hiring. At all stages of this litigation, UPS has conceded that it was hiring and has turned over comparative

evidence showing it was hiring. Further, while an employer's offering shifting reasons for not hiring an individual could potentially create an inference of discrimination, Lake v. Yellow Transp., Inc., 596 F.3d 871, 874-75 (8th Cir. 2010), such an inference is not automatic. See Bone v. G4S Youth Services, LLC, 686 F.3d 948, 957-58 (8th Cir. 2012). Poor job history was an additional reason Trendle testified to for not hiring Hunter, not a different or shifting reason. Although Trendle coded Hunter's application for "poor interview responses," UPS's system only allows interviewers to enter one code for rejecting an applicant, even if more than one of its pre-established codes might apply.

Additionally, an interviewer's evaluation of interview responses, although subjective, does not, in and of itself, create an inference of discrimination. Employers are entitled to compare applicants' performance during interviews. Tyler v. Univ. of Ark., 628 F.3d 980, 989 (8th Cir. 2011). "Although we have cautioned against the advancement of subjective considerations because they are easily fabricated, we have not outright prohibited their use." Wingate v. Gage Cnty. Sch. Dist., 528 F.3d 1074, 1080 (8th Cir. 2008); see also Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 858 (8th Cir. 2003). Instead, we have held that where the employer does not rely exclusively on subjective criteria, but also on objective criteria, the use of subjective considerations does not give rise to an inference of discrimination. Wingate, 528 F.3d at 1080. Here, UPS also relied on objective criteria such as job history and enrollment in school.

Finally, while the uneven application of objective criteria might warrant an inference of discrimination, Torgerson v. City. of Rochester, 643 F.3d 1031, 1049-50 (8th Cir. 2011), Hunter has failed to show that the objective criteria of job history was unevenly applied to him. Hunter presented comparative evidence showing that Trendle hired several applicants with no job history but did not hire others. Hunter was not similarly situated with any candidates with no job history because he had *poor* job history, in Trendle's opinion, not no job history. Trendle

specifically took issue with Hunter's having quit a similar job.  Hunter did present evidence that UPS interviewed two job applicants who had quit similar jobs, and that UPS hired one of those applicants.  But that applicant was not interviewed by Trendle and stated on his application that he quit because there was not enough work.   UPS stated legitimate non-discriminatory reasons for not hiring Hunter, and Hunter failed to show that a genuine issue of fact exists as to whether those reasons were pretextual.  Summary judgment was appropriate.

The judgment of the district court is affirmed.

_____