# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————

No. 10-1665

————

| | |
|---|---|
| Charity L. Wierman, | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Western District of Missouri. |
| Casey's General Stores, et al., | * |
| | * |
| Appellees. | * |

————

Submitted: December 14, 2010
Filed: March 31, 2011

————

Before RILEY, Chief Judge, BEAM and BENTON, Circuit Judges.

————

BENTON, Circuit Judge.

Charity L. Wierman sued her former employer, Casey's Marketing Company and Casey's General Stores, Inc. ("Casey's"). She asserts pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e–2000e-17) and the Missouri Human Rights Act (Mo. Rev. Stat. § 213.055) ("MHRA"). She also alleges retaliation in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2615(a)(2) ("FMLA"). Casey's moved for summary judgment on all claims, which the district court granted. Having jurisdiction under 28 U.S.C. § 1291, this court affirms in part, and reverses and remands in part.

I.

This court states the facts most favorably to Wierman. *See Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010). In March 2006, she began work with Casey's as a cashier at a convenience store in Missouri. A few months later, Casey's promoted her to store manager, and later transferred her to another store, which she managed until her termination on May 6, 2008.

As a store manager, Wierman reported to an area supervisor, who in turn reported to the district manager. Lisa J. Hercules was her supervisor until April 2008 (when Gregory Johnson became her supervisor). In December 2007, Hercules issued Wierman a corrective action statement for exceeding her allowable absences and for failing to provide timely notification of absences as required by Casey's policies. Wierman was suspended for five days without pay.

Wierman told Casey's in January 2008 that she was pregnant, with an August due date. Wierman called Casey's human resources department about her rights under the FMLA, but was told to call back closer to her due date. Over the next two months, she took some time off due to doctor's appointments, morning sickness, and pregnancy-related back pain—which Wierman made up by working Saturdays, her regular day off. Due to these absences, Hercules called Casey's HR department asking about FMLA coverage for Wierman, and was told that she was eligible for back-dated, intermittent leave under the FMLA.

In early April, Casey's HR department sent Wierman a letter with a summary of her FMLA rights, a Request for Leave form, and a Certification of Health Care Provider form (to be completed by her physician). The letter stated that it was HR's understanding that Wierman would be working limited hours due to her conditions/restrictions and that "beginning on March 6, 2008, any hours below the required 90 hours per pay period will be deducted from your 540 hours of available

FMLA time." The letter told her to return the forms by April 25. Wierman's supervisor Greg Johnson was copied on the letter (and acknowledged in his deposition that he was aware Wierman was eligible for FMLA leave). Wierman failed to respond to the letter, so Casey's sent a follow-up letter on April 30. It advised her to complete the paperwork by May 14, or risk having absences (beyond accrued sick leave) counted as violations of Casey's attendance policy. Johnson was copied on this letter as well. Wierman never completed this paperwork before her termination.

In early April, Wierman told her area supervisor Johnson that she was pregnant, and would need time off for doctor's appointments. Wierman recalls that Johnson said "okay." Asked whether Johnson ever said anything to lead her to believe that her pregnancy was a problem for him, Wierman responded that he "said that I pretty much needed to do my job more, and that I needed to be at work as much as I possibly could."

Johnson visited the Casey's store that Wierman managed on April 1, 11, 15, 18, 25, and 30. Johnson described these visits as "uneventful." Wierman said she felt "unwelcome" and "very uncomfortable" when Johnson visited, describing him as unfriendly. Sometime in mid-April, Wierman asked Johnson if she could have her assistant managers conduct the daily cigarette counts (by Casey's policy, managers were to conduct daily audits of the cigarette packs in a case behind the register). Because some packs were in an elevated case, Wierman had to climb a stool to count them. While her doctor had not restricted her from climbing, she was afraid of falling when four months pregnant with her first child, and told Johnson so. She wanted an assistant manager to count the packs in the elevated case while she counted the lower ones. Johnson refused her request, saying it was her job to do the audits. Wierman, however, had her assistant managers climb the stool to count the high-up cigarettes.

Wierman was admittedly tardy or absent on several occasions in late April and early May. On April 29, after working her regular nine-hour shift, Wierman called

Johnson from home to notify him that the store's cook would not be at work because of a death in his family. Per Casey's policy, Johnson told her to find a replacement, or to cover it herself. Wierman agreed to cover the shift, but asked if she could first eat dinner and rest her feet for a couple of hours. Johnson refused, telling her to report to the store immediately. Wierman, however, ate and rested her feet, then proceeded to work a double shift as directed. Johnson testified that Wierman should have not have taken a break to rest her feet and eat, but instead should have worked the entire 16-hour double shift. After working the double shift, Wierman asked Johnson if she could take off work the next day due to fatigue, and that she had found another employee to cover her shift. Johnson refused her request. The next morning, before her shift began, Wierman left Johnson a voicemail message that she would be unable to work her shift because of fatigue and that another employee would cover it.

Johnson visited the store that day (April 30) to review video from the security surveillance cameras—timing that Wierman finds suspicious, though Casey's area supervisors periodically review security video. Reviewing the video from the previous week, Johnson discovered that Wierman was late to work on April 21, 25, and 28. Wierman admits being tardy then, and failing to notify Johnson that she would be late, but notes that her tardiness was due to morning sickness or pregnancy-related back pain (Wierman lived 20 miles from the store and twice that week pulled over en route to be sick). Wierman also left early on May 2 with a pregnancy-related migraine headache after arranging coverage by an assistant manager. Johnson later testified that regardless whether absences were pregnancy-related or how many days of sick leave she had accrued, Wierman did not provide timely notice of her absences or tardiness on these dates.

Johnson's review of the security video on April 30 also revealed that Wierman was taking food and drink from Casey's without paying. By Casey's policy, "[a]ll merchandise purchased by an employee must be paid for before consumption, use, or removal from the store." While working, Casey's employees are allowed free

-4-

fountain drinks and can purchase Casey's prepared foods at a discount. Employees must pay full price for pre-packaged items sold in the store. Casey's requires all items to be rung up on the register—even if they are free. Casey's also requires that the employee print two receipts of each transaction (whether free, discounted, or full price): one that she signs and places in a shift-audit envelope, and another kept by the employee for her records. While Casey's reserves the right to ask for a receipt from employees, its policy also provides: "An employee who fails to properly pay for products as required by this policy, or who fails to properly handle his or her receipts, will be subject to immediate disciplinary action up to and including termination."

According to Casey's, the security video for April 21 shows Wierman consuming a fountain drink, a bottle of soda from a cooler, and a Hostess snack without first ringing them up or paying for them. Wierman submitted a declaration that she paid for the bottled soda and the Hostess snack at some point before the end of her shift, which was her practice. Although the fountain drink she consumed was free under Casey's policy, Wierman does not allege that she rang these items up on the cash register, prepared two receipts, and paid for the bottled soda and Hostess snack before consumption, as required by Casey's policy.

Casey's asserts that the April 29 video shows Wierman consuming a fountain drink, eating fresh donuts from a donut case, and eating a breakfast pizza—all without ringing them up. Wierman counters that the video does not show whether they were stale or fresh, and it was her practice to pay for prepared items at the first available opportunity or at the end of her shift. She testified that, though it was against Casey's policy, it was common practice to eat stale items without paying for them and that prior area supervisors allowed it. Wierman does not allege that she complied with Casey's policy by paying for the items before consumption, or ringing them up on the cash register before consumption (even for free items). Johnson's review of the shift-audit envelopes for April 21 and 29 confirmed that Wierman had not placed any signed receipts in the envelope.

-5-

On May 1, Johnson left a voicemail with Casey's HR department. He stated that although Wierman was pregnant and would be going on FMLA leave, she was coming in late and not notifying him. Johnson also stated that he reviewed the security video and noticed that Wierman was taking bakery items and drinks without paying for them. He said he had discussed the situation with his supervisor, and that they wanted to dismiss Wierman. An HR representative left Johnson a return voicemail, advising him to get Wierman's side of the story and give her every opportunity to explain her behavior, then take appropriate action. The next day, May 2, Wierman left work early because of a pregnancy-related migraine headache, after arranging coverage by an assistant manager.

In late April and early May, Johnson drafted three corrective actions that he delivered to Wierman when she was terminated on May 6, 2008. In a corrective action dated April 29 and delivered on May 6, Johnson noted that Wierman's cigarette totals were off and that she had failed to 1) comply with an earlier request to conduct midday audits until further notice, or 2) delegate this task to other members of management.

In a corrective action dated April 30 and delivered May 6, Johnson warned her about excessive absenteeism and tardiness. The warning specified that Wierman was tardy on April 21, 25, and 28, was absent on April 30, and left early on May 2. It also noted she had failed to give appropriate notice (at least two hours) before taking leave.

In a corrective action dated May 2 and delivered May 6, Johnson stated that on the week of April 21-25, Wierman "was observed by video surveillance taking a donut per day and/or cookie per day." He also stated that she did not use the register to ring up drinks under the employee discount, and there were no receipts for the merchandise consumed. Johnson explained that the "scope and magnitude of this violation warrants immediate dismissal." He did not mention in the corrective action Wierman's consumption of the Hostess snack, the breakfast pizza, or the bottled soda.

With regard to the third corrective action that resulted in termination, Wierman disputes Johnson's statement that she "took a donut and/or cookie per day." Johnson admits this was inaccurate; the termination was based on the videos from two days, April 21 and 29. Although she admitted in her deposition that once or twice she may have failed to pay for a stale item, she testified that she paid for pre-packaged items and items prepared by Casey's before the end of her shift. The two area supervisors who oversaw Wierman before Johnson both testified they never saw Wierman take products without paying.

When Johnson terminated Wierman on May 6, he gave her the three corrective action statements and an employee separation form, and told her she was fired. The separation form had the box checked for the reason "Unathorized Removal of Co. Property," and explained that Wierman was discharged because video surveillance revealed "consumption of bakery items and fountain drinks . . . without paying, no reciepts [sic] found. Excessive tardiness and absence thru employment for three years." Johnson did not give Wierman an opportunity to explain her behavior, or ask her to produce any receipts. During the litigation, she has not produced any purchase receipts, and does not dispute that Johnson did not find signed receipts from Wierman in the shift-audit envelopes.

After her termination, Wierman filed a charge of discrimination with the Missouri Commission on Human Rights and the Equal Employment Opportunity Commission. After they issued Wierman right-to-sue notices, she sued Casey's, alleging pregnancy discrimination in violation of Title VII, the FMLA, and the Missouri Human Rights Act. Casey's moved for summary judgment on all claims, which the district court granted. This appeal followed.

II.

Wierman challenges the grant of summary judgment for Casey's. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Reeves* **v.** *Sanderson Plumbing Prods.*, *Inc.*, 530 U.S. 133, 150 (2000).

This court reviews a grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences, without resort to speculation, in favor of the non-moving party. *See Hitt v. Harsco Corp.*, 356 F.3d 920, 923-24 (8th Cir. 2004). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A.

Title VII of the Civil Rights of 1964, 42 U.S.C. §§ 2000e–2000e-17, prohibits discrimination in employment on the basis of sex. As amended by the Pregnancy Discrimination Act of 1978, sex-based discrimination under Title VII includes discrimination based on "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

Because Wierman does not identify direct evidence of pregnancy discrimination, she can preclude summary judgment only by creating an inference of

discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* **Elam v. Regions Fin. Corp.**, 601 F.3d 873, 878 (8th Cir. 2010). Under *McDonnell Douglas*, Wierman must first establish a prima facie case of discrimination: 1) she is a member of a protected group; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) she was discharged under circumstances giving rise to an inference of discrimination. *See* **id.** at 879.

If she establishes a prima facie case, the burden of production shifts to Casey's to articulate a "non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." **Id.** If Casey's meets this burden, Wierman must then produce evidence sufficient to create a genuine issue of material fact showing that Casey's explanation is merely a pretext for unlawful discrimination. **Id.** "[T]he issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action." **Roberts v. Park Nicollet Health Servs.**, 528 F.3d 1123, 1127 (8th Cir. 2008) (emphasis in original) (internal quotation marks omitted).

The district court assumed without deciding that Wierman met her prima facie burden, then granted summary judgment to Casey's because Wierman failed to identify sufficient evidence that Casey's reasons for firing her were a pretext for pregnancy discrimination. On appeal, Casey's contests only the last element of Wierman's prima facie claim, asserting that her termination did not occur under circumstances giving rise to an inference of discrimination, i.e., that there is no connection between Wierman's protected status and her termination. Such an inference arises when it is more likely than not that the employer's actions were based on unlawful discrimination. *See* **Wallin v. Minn. Dept. of Corr.**, 153 F.3d 681, 687 (8th Cir. 1998). One way a plaintiff can establish an inference of discrimination is to prove that she was treated less favorably than similarly-situated employees who were

not in her protected class. *See **Johnson v. Legal Servs. of Ark., Inc.**, 813 F.2d 893, 896 (8th Cir. 1987).

Wierman does not address this part of the prima facie case, focusing instead on the district court's holding that Casey's stated reasons for firing Wierman were not pretextual. As part of her pretext argument, Wierman does claim that Casey's treated her less favorably than other similarly-situated employees, who were not fired despite occasionally eating stale baked goods or failing to ring up free fountain drinks. To be similarly situated, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." ***Cherry v. Ritenour Sch. Dist.***, 361 F.3d 474, 479 (8th Cir. 2004) (internal quotation marks omitted); *see also **Harvey v. Anheuser-Busch, Inc.***, 38 F.3d 968, 972 (8th Cir. 1994) (noting that employees are similarly-situated when they are "similarly situated in all relevant respects" and "are involved in or accused of the same offense and are disciplined in different ways.") (internal quotation marks omitted).

Wierman does not identify any similarly-situated individuals for comparison. She points out that neither of her two prior area supervisors (before Greg Johnson) ever disciplined anyone for eating a staled baked good, or for failing to ring up and file a receipt for an employee's free fountain drinks. However, Wierman fails to identify a Casey's manager who was *not* fired by Johnson (or any other area supervisor) after Casey's became aware the manager was consuming pre-packaged goods and not paying for them in advance (as all Casey's employees are required to pay full-price in advance for such items). In fact, one of Wierman's prior supervisors indicated that while she had not yet "caught" anyone drinking a fountain drink without first ringing it up, she would probably fire the employee if she did. Wierman has not cited any evidence that similarly-situated store managers were accused of similar misconduct and were disciplined differently.

The only other conduct Wierman identifies that arguably raises an inference of pregnancy discrimination is the "suspicious" timing of her discharge, just days after she took time off for pregnancy-related reasons. *See Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113-14 (8th Cir. 2001) (temporal proximity there was sufficient to establish prima facie case of discrimination, but not to show pretext). Under this court's precedents, a temporal proximity of four days is sufficient to make a prima facie case (Wierman left work early on May 2 with a pregnancy-related migraine headache, and was fired May 6). *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002) (holding that a two-week interval between an employee's FMLA leave and subsequent discharge was "sufficient, but barely so, to establish causation," and noting that the *McDonnell Douglas* framework "requires only a minimal showing before requiring the employer to explain its actions"); *Sprenger*, 253 F.3d at 1113-14 (ruling that proximity of a "matter of weeks" between disclosure of a potentially-disabling condition and adverse employment action was sufficient for a prima facie case of discrimination).

In response, Casey's provides nondiscriminatory, legitimate reasons for terminating Wierman's employment. Casey's reasons include Wierman's recurring absences and tardiness without giving timely notice, taking pre-packaged items such as the bottled soda and Hostess snack without paying for them, failing to ring up items (whether free, discounted, or full-price) before consumption, failing to place receipts for her purchases in the shift-audit envelope, and failing to conduct the mid-day cigarette audits as required. On her employee separation form, Johnson's stated reason for terminating Wierman was the unauthorized removal of Casey's property, as well as her excessive tardiness and absences. Employee theft and violations of company policy are legitimate, nondiscriminatory reasons for termination. *See Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 610 (8th Cir. 2006) (finding that knowingly violating company policy by offering discontinued two-for-one discounts was a legitimate, nondiscriminatory reason for termination); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999) (en banc) (violating company policies is a

legitimate reason for termination). Accordingly, the burden ultimately rests on Wierman to show "a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination." *See McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 862 (8th Cir. 2009).

To rebut the legitimate, nondiscriminatory reasons set forth by Casey's, Wierman must point to "'enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions.'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005) (emphasis omitted) (quoting *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 n.8 (8th Cir. 1994)). Wierman claims that she has shown pretext (that Casey's proffered reasons are unworthy of credence) through her evidence of: 1) Casey's "shifting" reasons for terminating Wierman; 2) Casey's past failure to fully enforce its employee discount policies; 3) Johnson's failure to ask Wierman for her purchase receipts or her side of the story when terminating her; 4) the suspicious timing of Johnson's visit to her store to view security video—a day Wierman took off and the day after a confrontation with Johnson; and 5) the suspicious timing of her discharge, just days after Wierman took time off for pregnancy-related reasons.

Wierman claims that Casey's shifting reasons for terminating Wierman are evidence of pretext. "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Allen Health Sys., Inc.*, 302 F.3d at 835 (internal quotation marks omitted). In the corrective action dated May 2, Johnson claimed the video showed Wierman "took a donut per day and/or cookie per day." In an employee separation form Johnson filled out May 6, he indicated Wierman was fired for unauthorized removal of company property, indicating the video showed her consuming "bakery items and fountain drinks" without paying or placing receipts in the shift-audit envelope. The form also

-12-

mentioned Wierman's "[e]xcessive tardiness and absence[s]." In its motion for summary judgment, Casey's raised for the first time that Wierman had consumed a bottled soda, a Hostess snack, and a piece of breakfast pizza without first paying for these items.

This discrepancy, however, is not sufficient to make a triable issue as to pretext. *See, e.g.*, ***Allen Health Sys., Inc.***, 302 F.3d at 835 (explaining that pointing out additional aspects of the same behavior is not probative of pretext); *see also **EEOC v. Trans States Airlines, Inc.***, 462 F.3d 987, 995 (8th Cir. 2006) (contrasting a situation with two completely different explanations for the termination, which would be evidence of pretext, with a situation where minor discrepancies appeared in a consistent explanation of why the plaintiff was fired). The discrepancy between Casey's various documents do not undermine its consistent reason for terminating Wierman—her failure to comply with Casey's employee discount policy by not ringing up store merchandise, and tendering payment if necessary, in advance of consumption.

Wierman also argues that Casey's past failure to fully enforce its employee discount policies is evidence of pretext. She contends that her termination for trivial violations of Casey's policies is evidence of pretext, because Casey's did not produce evidence of an employee terminated for failure to ring up free fountain drinks or for failure to pay *in advance* for store merchandise eventually paid for (Wierman claims she paid for the non-stale items she consumed before the end of her shifts). Wierman also emphasizes that prior area supervisors allowed employees to eat stale bakery items without ringing them up or paying.

However, at the pretext stage of the *McDonnell Douglas* burden-shifting framework, the burden is on Wierman to show sufficient evidence of disparate treatment. *See **Elam***, 601 F.3d at 879. As discussed, Wierman does not point to any comparable employee who was treated more favorably than herself by Johnson, the

-13-

decision maker in this case. *See **Britton v. City of Poplar Bluff***, 244 F.3d 994, 998 (8th Cir. 2001) ("When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.") (internal quotations omitted). Wierman argues that where the evidence of disparate treatment is offered as only one component of the plaintiff's circumstantial evidence of pretext, the evidence does not need to reach the strong degree of similarity required of plaintiffs who present no proof of discrimination or pretext aside from disparate treatment. *See **Scott v. County of Ramsey***, 180 F.3d 913, 917-18 (8th Cir. 1999). However, Wierman has failed to come forward with evidence of any remotely similarly-situated employee who was accused of remotely-comparable conduct and not fired by any other area supervisor. Stale items from Casey's bakery are not comparable to pre-packaged items (which justify an expectation of profit and need to prevent even inadvertent theft). Wierman does not deny that she consumed items that were not stale without paying in advance, including a Hostess snack and a bottled soda—in clear violation of Casey's employee discount policy. The burden is on her to identify evidence that Johnson, or other area supervisors, tolerated such violations while aware of them. Even under Wierman's relaxed standard, she has not carried this burden.

Wierman next argues that Johnson's failure to ask for her purchase receipts or her side of the story when terminating her is evidence of pretext. According to Wierman, the language in Casey's written employee discount policy—that Casey's "reserves the right to ask employees to show their receipts for any items consumed"—required Johnson to ask her for receipts before terminating her (she testified that she had kept receipts for her purchases for a few days afterward). Further, Wierman argues that Johnson's failure to comply with the HR representative's voicemail instructing him to get her side of the story and give her every opportunity to explain is evidence her termination was a pretext for pregnancy discrimination. However, the quoted language does not mandate that employees be asked for their receipts before termination, so Johnson did not deviate from Casey's policy. While Casey's reserves the right to ask for a receipt from employees, Casey's

-14-

policy also provides that "[a]n employee who fails to properly pay for products as required by this policy, or who fails to properly handle his or her receipts, will be subject to immediate disciplinary action up to and including termination." Additionally, no action of Casey's prevented Wierman from voluntarily producing her own purchase receipts, either at the time of her termination or in this litigation.

In any event, "shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough*, 559 F.3d at 863. Wierman must provide some evidence that Johnson's findings were motivated by unlawful discrimination, rather than a good-faith belief that Wierman had violated Casey's food policy. *See id.* at 862 ("The critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge."). Video footage—corroborated by the lack of receipts in the shift-audit envelope or any entries in the register's electronic journal—indicated that Wierman consumed merchandise without prior purchase. This evidence confirms a good-faith basis for Wierman's termination, and any failure to conduct a more searching inquiry is not evidence of pretext.

Wierman next suggests that the suspicious timing of Johnson's April 30 visit to her store to view surveillance video is evidence of pretext. On April 29, she worked a double shift because the store's cook had a death in the family, and Wierman asked Johnson if she could rest and eat dinner between shifts. Johnson denied her request. After working the double shift, she asked Johnson if she could take off work the next day due to fatigue, telling him she had found another employee to cover her shift. Johnson refused. The next morning, before her shift began, Wierman left Johnson a voicemail that she was unable to work her shift because of fatigue and that another employee would cover it. Johnson visited the store that day to review video from the surveillance cameras, discovering the violations for which she was eventually terminated. In its Statement of Position to the EEOC, Casey's

-15-

stated that "Johnson had heard employees from the Eldon Store complain about Wierman's attendance, so he reviewed surveillance video." In Johnson's deposition, he stated that he did not recall any employees complaining about Wierman's attendance, and was in her store to review video as part of a "routine inspection."

Wierman argues that the timing and Johnson's inconsistent explanations create an issue of pretext because it shows he was searching for a reason to discipline her. True, an employer's selective investigation of an employee in a protected group can support a claim of discriminatory intent. *See Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1155, 1160 (8th Cir. 2003) (evidence employer required more extensive documentation of pregnant employee's medical appointments than those of non-pregnant employees, in addition to employer's comments, supports the jury's finding of pregnancy discrimination); *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1194-95 (8th Cir. 1995) (ruling that a plaintiff subjected to "unprecedented job scrutiny" and required to meet brand-new job-performance guidelines within a short time after protected conduct occurred demonstrates a possible search for a pretextual basis for discipline); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 724 (8th Cir. 1985) (indicating in dicta that plaintiff might have evidence of discrimination had plaintiff shown that white employees were not scrutinized the same as plaintiff).

Under these cases, Wierman must provide some evidence that other employees were not subject to the same level of investigation for similar conduct. Wierman has not provided any evidence that Johnson's review of her store's surveillance tapes—a regular part of an area supervisor's job duties—was in any way more intensive, more frequent, or otherwise unprecedented when compared to other stores under Johnson's purview. Any discrepancy as to why Johnson reviewed the security video does not bear on a material fact in dispute, in light of the legitimacy of Casey's reasons for terminating her (violation of its attendance and employee discount policies). *See Trans States Airlines, Inc.*, 462 F.3d at 995 (finding that inconsistent explanations for the employer's reliance on an anonymous tip that its pilot was in a bar while in

uniform did not bear on a material fact in dispute: "Either way, the airline terminated [the plaintiff] for violation of its rule, and we think the distinctions in testimony about what convinced [the employer] to rely on the information are simply too fine to constitute substantial evidence of pretext.").

Wierman also claims that the suspicious timing of her discharge is evidence of pretext, as she was fired just days after 1) taking off work on April 30 for fatigue, and 2) leaving work early on May 2 with a pregnancy-related migraine. Any discriminatory inference based on this temporal proximity is dubious, as Johnson reviewed the video footage on April 30 and learned that Wierman was violating the employee discount policy, if not stealing. She was fired six days later, after Johnson drafted the corrective actions and consulted with his superiors and HR. The discovery of the video footage gives an explanation for the temporal proximity other than a discriminatory motive of Casey's, and is not evidence of pretext. *See Sprenger*, 253 F.3d at 1113-14 ("An employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than it takes to make a prima facie case], however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification.").

Finally, Wierman stresses her testimony (and subsequent written declaration) that she did not consume pre-packaged or non-stale Casey's merchandise without paying. Even if this were true, she admitted to not ringing up or paying for the items she consumed in advance, and she does not dispute that the shift-audit envelopes did not contain signed receipts for the items she was filmed eating and drinking. Even if she did pay for such items before her shift ended, the critical inquiry is whether Casey's had a good-faith belief she had violated its policies. *See McCullough*, 559 F.3d at 862; *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000) (holding that reliance on an honest-but-incorrect belief is not evidence of pretext).

Viewed either individually or cumulatively, Wierman's evidence neither undermines Casey's legitimate rationale for firing her, nor permits a reasonable inference that pregnancy discrimination motivated her termination. The inferences Wierman argues for do not follow naturally from the evidence presented, which show that she did not meet the legitimate work expectations of Casey's. Wierman claims that drinking a fountain soda without first ringing it up and eating a stale baked good are "trivial" violations. However, she was observed on surveillance video (and admitted to) failing to abide by Casey's policy with regard to pre-packaged items—that "[a]ll merchandise purchased by an employee must be paid for before consumption, use, or removal from the store." Johnson's review of the shift-audit envelopes and the register's electronic journal indicated that Wierman did not pay for the Casey's store merchandise she consumed. A violation of this policy was punishable by termination. Because no reasonable jury could find pretext or discrimination, this court affirms the grant of summary judgment to Casey's on Wierman's Title VII claim.

B.

Wierman appeals the district court's grant of summary judgment to Casey's on her retaliation claim under the FMLA, 29 U.S.C. § 2615(a)(2). This court reviews the district court's grant of summary judgment de novo. *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 850 (8th Cir. 2002). "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.*

The FMLA entitles an employee to twelve workweeks of leave during any twelve-month period if he or she has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is any "illness, injury,

-18-

impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

An employee can bring two types of claims under the FMLA: (1) "interference" claims where the employee alleges that the employer denied or interfered with her substantive rights under the FMLA; and (2) "retaliation" claims where the employee alleges that the employer discriminated against her for exercising her FMLA rights. *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008); 29 U.S.C. § 2615(a)(1)-(2). Wierman asserts a retaliation claim.

Like her pregnancy-discrimination claim, Wierman's FMLA retaliation claim is evaluated under the *McDonnell Douglas* framework. *See Phillips*, 547 F.3d at 912. To establish a prima facie case, she must show that: 1) she engaged in protected conduct; 2) she suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct. *See id.* "Materially adverse action" is action that "would deter a reasonable employee from making a charge of employment discrimination." *Fercello*, 612 F.3d at 1077-78. Unquestionably, termination is an adverse employment action. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008).

If Wierman meets her prima facie burden, Casey's must articulate a legitimate, non-retaliatory reason for its action. *Fercello*, 612 F.3d at 1078. If Casey's meets this burden, Wierman must then identify evidence sufficient to create a genuine issue of material fact whether Casey's proffered explanation is merely a pretext for unlawful retaliation. *Id.* The ultimate question of proof—the burden of which remains on the employee throughout the inquiry—is whether the employer's conduct was motivated by retaliatory intent. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006). The district court assumed without deciding that Wierman met her prima facie burden, then entered summary judgment for Casey's because Wierman failed to

-19-

support her contention that Casey's non-retaliatory reason for terminating her was pretextual.

Casey's argues that Wierman failed to meet her burden on the first and third prongs of the prima facie case, contending that she has not shown she was engaged in protected conduct or that there was a causal connection between the protected conduct she alleges and her termination. According to Casey's, Wierman did not engage in protected activity because she failed to complete her FMLA paperwork. "In order to benefit from the protections of the statute, an employee must provide [her] employer with enough information to show that [she] may need FMLA leave." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). However, "[a]n employee need not invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000). The employer's duties arise "when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Id.* (internal quotation marks omitted).

Wierman provided enough evidence that, before her termination, Casey's was on notice of her need for FMLA leave. Both Wierman and her area supervisor Lisa Hercules separately inquired with Casey's HR about her FMLA rights. Casey's responded with a letter that summarized her FMLA rights, requested that she fill out FMLA paperwork, and stated that it was HR's understanding that she would be working limited hours due to her conditions/restrictions and that any shortfall from her required hours would be considered FMLA leave. While Casey's was entitled to require Wierman to complete FMLA paperwork before she would be entitled to FMLA leave, *see* 29 C.F.R. § 825.305, Johnson terminated her *before* Casey's deadline for her to complete this paperwork.

In the interim, Wierman was tardy or absent from work for pregnancy-related reasons; she suffered from back pain, migraines, and morning sickness (Wierman,

who lived 20 miles from her store, testified that she regularly pulled over en route to be sick). Viewing the evidence most favorably to Wierman, Casey's and Johnson were on notice of Wierman's "serious health condition" and were awaiting her paperwork when Wierman took leave for symptoms related to this condition.[1]

Casey's also cannot use Wierman's termination before this deadline to argue that she never exercised her FMLA rights. *See Phillips*, 547 F.3d at 910 (rejecting argument that an employee's termination before FMLA certification means that she never exercised her FMLA rights, where employee's FMLA status was in flux at the time of termination); *Caldwell v. Holland of Tex., Inc.*, 208 F.3d 671, 677 (8th Cir. 2000) ("An employer does not avoid liability by discharging an employee who takes leave in order to seek treatment for a condition that is later held to be covered by the FMLA.").

Wierman has established a causal connection between her protected activity and the challenged action, sufficient for a prima facie case. On April 30, Johnson was copied on a letter establishing a deadline of May 14 for Wierman to complete her FMLA paperwork. Wierman, who had been approved for intermittent FMLA leave for her pregnancy, left early on May 2 with a pregnancy-related migraine. Johnson terminated her within a week, in part due to absences that may have been covered by FMLA. *See Allen Health Sys., Inc.*, 302 F.3d at 833 (finding two-week period

---

[1] In its brief, Casey's overstates the severity of the condition required for an expectant mother to be entitled to FMLA leave, claiming the mother must be incapacitated, not suffering "mere discomfort." FMLA regulations permit an expectant mother to take FMLA leave even where the mother "does not receive treatment from a health care provider during the absence, and even if the absence does not last for more than three consecutive calendar days. *For example, a pregnant employee may be unable to report to work because of severe morning sickness.*" 29 C.F.R. § 825.120(4) (emphasis added).

-21-

between FMLA-covered activity and adverse action was alone sufficient to meet causation requirement).

Wierman's FMLA retaliation claim nonetheless fails because she cannot show that Casey's proffered non-retaliatory reason—that she stole company property—was pretext for retaliation. She argues that the strength of her prima facie retaliation case, in combination with Casey's shifting reasons for firing her, raises genuine issues of fact whether her discharge for violation of company policy (if not theft) was a pretext for retaliation. This argument fails for many of the same reasons her Title VII discrimination case failed—a lack of sufficient evidence to cast doubt on Casey's legitimate, non-retaliatory reason for terminating Wierman.

First, Wierman's prima facie retaliation case is not so strong that it establishes pretext on its own. Johnson viewed video evidence of her violating company policy on or about the same date he learned of her upcoming FMLA paperwork deadline, and two days before she left work early on May 2. A plaintiff's prima facie retaliation case, built on temporal proximity, is undermined where the allegedly retaliatory motive coincides temporally with the non-retaliatory motive. *See id.* at 834 ("This gives an explanation for the temporal proximity other than a retaliatory motive of the employer."); *cf. Kiel*, 169 F.3d at 1136 ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."). Moreover, evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity. *See Smith v. Ashland, Inc.*, 250 F.3d 1167, 1174 (8th Cir. 2001).

Second, Wierman's argument that Casey's offered "shifting reasons" for her termination fails to establish pretext for retaliation, just as it failed to establish pretext for pregnancy discrimination. Even when added to her prima facie retaliation case, Casey's modification of the list of items Wierman allegedly stole is not the kind of

significant change that shows pretext for retaliation. *See Phillips*, 547 F.3d at 913 (rejecting claim of pretext where employer "merely" supplemented its original explanation). Rather than backing off the original explanation in Wierman's employee separation form ("unauthorized removal of company property"), Casey's has only pointed out an additional aspect of the same behavior; this is not pretext. *See Allen Health Sys., Inc.*, 302 F.3d at 835.

In a related argument, Wierman claims she was discharged for absences related to pregnancy, citing the reference on her employee separation form to her excessive tardiness and absences. However, the separation form had the box checked for "Unathorized Removal of Co. Property," not the boxes for either "Excess Absence" or "Excess Tardiness." The form elaborated that Wierman was discharged because video surveillance revealed "consumption of bakery items and fountain drinks . . . without paying, no receipts found. Excessive tardiness and absence thru employment for three years." In Johnson's testimony and in the voicemail he left with HR before terminating her, he stated with regard to her absences and tardiness that the issue was Wierman's failure to give timely notice to him of her absences. Further, in December 2007 (before Wierman informed Casey's she was pregnant), her prior area supervisor Hercules issued her a corrective action for exceeding her allowable absences and for failing to provide timely notification of absences as required by Casey's policies, which resulted in a suspension without pay for five days. In light of Wierman's clear and admitted violation of Casey's employee-discount policy, the absence evidence is not sufficient to create a genuine issue of fact whether Casey's proffered explanation is merely a pretext for unlawful retaliation.

Wierman does not create an issue of fact that Casey's non-discriminatory reason for her termination was pretext for FMLA retaliation. Her retaliation claims fails, and summary judgment for Casey's was proper. *See Sprenger*, 253 F.3d at 1113-14 ("An employee's attempt to prove pretext or actual discrimination requires more substantial evidence, however, because unlike evidence establishing the prima facie case,

evidence of pretext and discrimination is viewed in light of the employer's justification.").

## C.

Wierman also challenges the grant of summary judgment on her claim that Casey's discriminated against her in violation of the Missouri Human Rights Act (MHRA). *See* Mo. Rev. Stat. §§ 213.010-213.137. This court reviews a grant of summary judgment de novo. ***EEOC v. Con-Way Freight, Inc.***, 622 F.3d 933, 936 (8th Cir. 2010). Under Missouri law, "[s]ummary judgment seldom should be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence. ***Hill v. Ford Motor Co.***, 277 S.W.3d 659, 664-65 (Mo. banc 2009).

Section 213.055.1(1)(a) of the MHRA prohibits an employer from discharging or otherwise discriminating against an individual based on sex. This prohibition includes pregnancy discrimination. *See **Self v. Midwest Orthopedics Foot & Ankle, P.C.***, 272 S.W.3d 364, 366-71 (Mo. App. 2008).

The district court did not separately analyze Wierman's MHRA claim, noting: "MHRA claims are analyzed under the same standards as federal employment discrimination claims." This was error. The Supreme Court of Missouri has stated that the MHRA's "safeguards are not identical to the federal standards and can offer greater discrimination protection." ***Daugherty v. City of Maryland Heights***, 231 S.W.3d 814, 818-19 (Mo. banc 2007). In particular, that court noted that the MHRA defines "discrimination" to include "***any*** unfair treatment based on . . . sex . . . as it relates to employment." ***Id.*** at 819 (quoting Mo. Rev. Stat. § 213.010(5)) (emphasis added in *Daugherty*). A plaintiff alleging pregnancy discrimination in violation of the MHRA can avoid summary judgment by showing that her pregnancy was "a contributing factor"—not a "substantial or determining factor"—in the challenged

-24-

decision. *Id.* at 819-20; *see also* **Hill**, 277 S.W.3d at 664-65. Missouri courts define a "contributing factor" as one "that contributed a share in anything or has a part in producing the effect." **Williams v. Trans States Airlines, Inc.**, 281 S.W.3d 854, 867 (Mo. App. 2009) (internal quotation marks and citations omitted).

Wierman argues that by applying the incorrect legal standard, the district court must be reversed. To the contrary, this court may affirm for any reason supported in the record, even if that reason is different from the rationale of the district court. *See* **Reasonover v. St. Louis Cnty., Mo.**, 447 F.3d 569, 578-79 (8th Cir. 2006). This court may affirm the district court even if it committed legal error in reaching the correct result. *See* **McClain v. Kitchen**, 659 F.2d 870, 873 (8th Cir. 1981) (per curiam); **U.S. Gypsum Co. v. Greif Bros. Cooperage Corp.**, 389 F.2d 252, 262 (8th Cir. 1968); **City of Grandview, Mo. v. Hudson**, 377 F.2d 694, 696 (8th Cir. 1967); *see also* Wright, Miller & Kane, 10A Federal Practice & Procedure § 2716 (3d ed.) ("The appellate court does not have to affirm a decision on a Rule 56 motion for the same reasons that persuaded the court below to grant the motion. On the contrary, it can find another ground for concluding that the movant is entitled to judgment as a matter of law and ignore any erroneous basis that the district court may have employed.").

Wierman's pregnancy was clearly not a *motivating* factor in her discharge, given that she was observed on camera (and admitted) violating Casey's employee discount policies. However, Wierman has demonstrated a genuine issue of material fact whether her pregnancy was a *contributing* factor to her termination under the analysis of *Daugherty* and its progeny. *See* **Con-Way Freight, Inc.**, 622 F.3d at 938 (affirming the district court's grant of summary judgment in favor of employer on Title VII claim, but remanding on MHRA discrimination claim).

Viewing the facts most favorably to Wierman, she was fired four days after leaving work early with a pregnancy-related migraine, and less than a week after her supervisor (who was aware of the pregnancy) was copied on a letter establishing a

-25-

two-week deadline for her to complete FMLA paperwork. Johnson insisted that she climb a footstool to conduct the cigarette audits after she told him she was afraid of falling off the stool when four months pregnant with her first child. Johnson refused her request to rest and eat in the middle of working a 16-hour double shift, then went to her store to review video when she took the next day off. In one of the three corrective actions issued to Wierman at her termination, Johnson faulted Wierman for excessive absenteeism and tardiness, including dates she was absent or tardy for pregnancy-related reasons. When the evidence is viewed most favorably to Wierman, giving her the benefit of all reasonable inferences, sufficient evidence has been identified to allow a reasonable jury to conclude that her pregnancy contributed a slight share in Casey's decision to fire her. *See McBryde v. Ritenour Sch. Dist.*, 207 S.W.3d 162, 170 (Mo. App. 2006) (noting that "in enacting the MHRA, the legislature sought to prohibit *any* consideration of race or other improper characteristic *no matter how slight* in employment decisions. The plain meaning of the MHRA imposes liability on an employer when an improper consideration is a contributing factor, *regardless if other factors also exist*.") (emphasis added).

Because this court concludes the district court properly granted summary judgment on the Title VII and FMLA claims, the case would ordinarily be remanded with directions to modify the final judgment so as to dismiss Wierman's MHRA claim without prejudice, so that it may be decided by the courts of Missouri. *See Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir. 1997) ("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without prejudice to avoid needless decisions of state law.") (internal quotation marks and citation omitted); 28 U.S.C. § 1367(c)(3) (court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction).

However, in this case, there appears to be federal subject matter jurisdiction over the state-law claim based on diversity of citizenship. *See* 28 U.S.C. § 1332(a)(1)

-26-

("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States"); 28 U.S.C. § 1332(c)(1) ("For the purposes of this section . . . a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business"). The complaint alleged that Wierman is a citizen of Missouri and that the amount in controversy exceeds $75,000, exclusive of interest and costs. It further alleged that Casey's General Stores, Inc., the parent company of Casey's Marketing Company, is an Iowa corporation.[2] Casey's Marketing Company is a wholly-owned subsidiary of Casey's General Stores, Inc., and is also an Iowa corporation. While both Casey's General Stores, Inc. and Casey's Marketing Company are authorized and do business in Missouri, "a corporation's additional presence in another state does not destroy diversity jurisdiction." *Ashland, Inc.*, 250 F.3d at 1172; *see also Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1192 (2010) (holding that a corporation's "principal place of business" for purposes of 28 U.S.C. § 1332(c)(1) refers to the place where a corporation's high level officers direct, control, and coordinate the corporation's activities, i.e., its "nerve center," which will typically be found at its corporate headquarters). Therefore, subject to further proceedings in the district court about diversity jurisdiction, Wierman's MHRA claim is remanded for trial. *See Barclay Square Properties v. Midwest Federal Sav. and Loan Ass'n of Minneapolis*, 893 F.2d 968, 969 (8th Cir. 1990) (noting that the courts of appeal may either treat the complaint as amended to properly allege diversity or allow the party asserting that subject matter jurisdiction exists to amend its complaint to properly allege diversity); 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.").

---

[2] Casey's General Stores, Inc. was granted summary judgment on the uncontested ground that Wierman was not an employee of Casey's General Stores, Inc., which she does not challenge on appeal.

\* \* \* \* \* \* \*

The judgment of the district court is affirmed on the Title VII and FMLA claims, and Wierman's state-law claim is remanded for proceedings consistent with this opinion.

_____