# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2160

_____

| | | |
|---|---|---|
| Ron Ryan, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Nebraska. |
| | * | |
| Capital Contractors, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 10, 2012
Filed: May 29, 2012

_____

Before WOLLMAN, LOKEN, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Ron Ryan sued his former employer, Capital Contractors, Inc. (Capital Contractors), under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Nebraska Fair Employment Practices Act (NFEPA), Neb. Rev. Stat. Ann. § 48-1101 et seq. The district court[1] granted Capital Contractors' motion for summary judgment on all claims. Ryan appealed with respect to his ADA and NFEPA claims. We affirm.

_____

[1]The Honorable Richard Kopf, United States District Judge for the District of Nebraska.

## I.

We state the facts in the light most favorable to Ryan. See Wierman v. Casey's Gen. Stores, 638 F.3d 984, 989 (8th Cir. 2011). Ryan was hired by Capital Contractors in 1973. He worked until his voluntary departure in 1999. Ryan was rehired in 2000 and again left voluntarily in 2003. Ryan was hired for a third time in 2005, and he was terminated on December 1, 2008.

A neuropsychological evaluation showed that Ryan has a Full Scale IQ of fifty-six, which corresponds to the mildly to moderately mentally retarded range. Ryan also speaks with a stutter that becomes more pronounced when he is excited, nervous, or tired. Ryan was placed in special education classes in school. Although he graduated from high school, he stated that he "just passed through." He has difficulty reading and writing, and a vocational rehabilitation specialist concluded that Ryan's cognitive functioning limits his ability to speak and work. Ryan, however, never informed any member of Capital Contractors' management that he was disabled, and his limitations did not keep him from completing the tasks expected of him at work. Although Ryan's co-workers and management at Capital Contractors knew that he was a little "slow," they also noticed that he could be "pretty inventive." Davis Crist, the vice president and general manager of Capital Contractors, testified that Ryan was probably in the "lower half" of Capital Contractors employees in terms of cognitive function, but he was not the lowest.

Prior to his termination, Ryan was working as a sandblaster. Troy Collins, the paint room foreman, was his supervisor. Collins oversaw Ryan and one other employee, Gregg Dissmeyer. Foremen at Capital Contractors work alongside the employees they oversee. The foreman can direct the day-to-day tasks of the workers, but they have limited authority and cannot select workers for overtime or discipline the workers directly, although they can write up a worker for tardiness or other infractions.

Physical horseplay and name calling done in a joking manner were common at Capital Contractors, but the company had a "no fighting" policy and employees knew that fighting would result in termination. Ryan testified that Collins frequently called him "fucking dummy," "fucking retard," "stupid," "idiot," and "numb nuts." According to Ryan, Collins also asked Ryan if his mother had dropped him on his head when he was little. None of these derogatory comments were made in the presence of management. Ryan also called Collins names–"fatty," "Shrek," "giant," and "bitch"–as well. Additionally, Ryan and Collins would give each other "charley horses" and "titty twisters," and regularly pinch each other. Ryan testified that although he repeatedly asked Collins to stop this behavior, Collins did not do so.

On November 26, 2008, an altercation took place between Ryan and Collins. Collins told Ryan to "get the fuck over there and start grinding." Ryan asked Collins either, "what's up your butt?" or "what's up your ass?," and began to walk away. According to Dissmeyer, the only eyewitness, Collins then grabbed Ryan by the coat with both hands. Dissmeyer's written statement, from the day of the incident, states that Collins then "kinda picked Ronnie up" and shook him.[2] After grabbing Ryan, Collins told him that if he did not want to work he could go home, and Ryan "ended up in the pit, from a small push from [Collins]." Ryan then swung at Collins and knocked the breathing device off of Collins's respirator mask. Collins told Ryan to go home and reported the incident to his supervisor.

At the time of the incident, Jerry Borrell was the production superintendent and Collins's direct supervisor. On November 26, 2008, however, Ron Neidecker was

---

[2]We note that Dissmeyer's written statement was later called into question. Jerry Borrell testified that Dissmeyer told him only that he saw Collins grab Ryan and Ryan take a swing, and that there was nothing about "falling in the pit or anything like that." In his deposition, Dissmeyer said that the wording he used in the written report was "a little extreme." For the purposes of a motion for summary judgment, however, we consider the facts in the light most favorable to Ryan.

acting as superintendent in Borrell's absence. Neidecker testified that he first learned of the incident when Ryan approached him during the morning break. Ryan told Neidecker that Collins had grabbed him and that he (Ryan) then had taken a swing at Collins. At the end of the break, Collins spoke to Neidecker. Someone reported the incident to Crist, the general manager. Crist and Borrell each spoke with Ryan, Collins, and Dissmeyer. Crist made the ultimate decision to terminate Ryan, with input from Borrell. Crist determined that Ryan would be terminated "the minute he [Ryan] admitted to striking a fellow employee." According to both Crist and Borrell, it took longer to decide how to deal with Collins because he was a supervisor.

On December 1, 2008, Ryan was terminated from his employment with Capital Contractors. Collins was demoted from foreman status, lost the pay associated with being a foreman, was suspended without pay for three days, and was placed on probation for ninety days. The work reprimand report stated that Ryan was dismissed for striking a fellow employee and that Collins was disciplined for aggressive behavior toward a subordinate. Two or three days later, Ryan asked Frank Sidles, the owner of Capital Contractors, if he could have his job back. Sidles refused to rehire him.

Collins was terminated in January of 2009, during his probationary period, after Crist and Borrell received complaints from several individuals that Collins engaged in unwelcome physical contact. Collins was rehired as a painter in July 2009, with the stipulation that he would hold no supervisory positions.

Ryan sued Capital Contractors under theories of age and disability discrimination. He appeals from the district court's grant of summary judgment with respect to his disability discrimination claims. Ryan alleges that he was wrongfully terminated, arguing that he was treated differently than Collins under Capital Contractors's anti-violence policy because of his disability. Ryan also alleges that he was subjected to a hostile work environment in violation of the ADA.

-4-

II.

We review *de novo* the district court's grant of summary judgment, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party. Wierman, 638 F.3d at 993. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Wierman, 638 F.3d at 993 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). At the summary judgment stage, "the nonmoving party must set forth specific facts sufficient to raise a genuine issue for trial and cannot rest on allegations in the pleadings." Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1393 (8th Cir. 1997) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

A. Wrongful Termination

In the absence of direct evidence of discrimination, we evaluate Ryan's wrongful termination claim under the familiar McDonnell Douglas framework. See Kozisek v. Cnty. of Seward, Neb., 539 F.3d 930, 935 (8th Cir. 2008). "To establish a prima facie case under the ADA, [Ryan] must show that he was a disabled person within the meaning of the ADA, that he was qualified to perform the essential functions of the job, and that he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." Id. at 934 (citing Miners v. Cargill Commc'ns, Inc., 113 F.3d 820, 823 (8th Cir. 1997)).[3] Once

---

[3]"The disability discrimination provision in the NFEPA are patterned after the ADA, and the statutory definitions of 'disability' and 'qualified individual with a disability' contained in the NFEPA are virtually identical to the definitions of the ADA." Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 723 (8th Cir. 2002) (citing Neb. Rev. Stat. Ann. § 48-1102(9) & (10); 42 U.S.C. §§ 12102(2), 12111(8)). "In construing the NFEPA, Nebraska courts have looked to federal decisions, because the

Ryan has established a prima facie case, the burden shifts to Capital Contractors to articulate a legitimate, non-discriminatory reason for Ryan's termination; if it does so, the burden shifts back to Ryan to demonstrate that Capital Contractors's proffered reason is a pretext for unlawful discrimination. Id. at 935 (citations omitted).

Although it is not clear that Ryan has established the third element of a prima facie case, the parties have focused their arguments on whether Ryan can establish pretext. Accordingly, we assume without deciding that Ryan established a prima facie case of disability discrimination. Capital Contractors has articulated a legitimate, non-discriminatory reason for terminating Ryan: that by striking Collins he violated the company's policy against fighting in the workplace. "We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee." Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006) (citation omitted). Furthermore, "[i]t is beyond question that an employee's striking of a fellow employee is a legitimate, nondiscriminatory reason for dismissal." Ward v. Procter & Gamble Paper Prods. Co., 111 F.3d 558, 560 (8th Cir. 1997). We thus turn to the question whether Ryan can show that Capital Contractors's reason is pretext for intentional discrimination.

Ryan argues that he can demonstrate pretext because he was treated differently than a similarly situated employee, Collins. "Instances of disparate treatment can support a claim of pretext," but Ryan must show that he and Collins were "similarly situated in all relevant respects." Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 484, 487 (8th Cir. 1998) (citation omitted), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011) (en banc). The "relevant" aspects

NFEPA is patterned after Title VII and the ADA." Id. Thus, our analysis of Ryan's ADA claims and our affirmance of the district court's grant of summary judgment applies to Ryan's NFEPA claims as well.

of an employment situation are the conduct of the employees and any disparity in their discipline. See Chappell v. Bilco Co., 675 F.3d 1110, 1118-19 (8th Cir. 2012) (citations omitted). In the context of a physical altercation between two employees, we have also considered whether the employees held the same position or had similar disciplinary records. See Ward, 111 F.3d at 561.

In Ward, we upheld a grant of summary judgment to an employer in the face of an employee's allegation that her termination was a pretext for racial discrimination. Id. The employee became involved in an argument with her team leader that escalated when the team leader grabbed the employee's hand and the employee hit the team leader. Id. at 559. The employee was then fired based on the employer's rules against fighting, but the team leader was not. Id. at 560. We noted that although both were "involved in the same argument, their actions are clearly differentiated because the incident involved two separate levels of escalation." Id. at 561. The team leader had initiated the physical component of the argument, but the employee was the only one who struck someone. We concluded that the employer was "not obligated to treat the two escalations as substantially similar" when they involved "objectively different conduct." Id. Accordingly, we held that the employee could not demonstrate pretext because the employee and team leader were not similarly situated.

The incident at issue here also involved objectively different conduct. Collins instigated the incident by cursing when he instructed Ryan to return to work, but Ryan escalated it when he replied, "what's up your butt/ass?" Ryan again intensified the conflict by hitting Collins after Collins grabbed him. Collins then walked away from the argument. Ryan emphasizes that Capital Contractors's zero-tolerance policy against fighting applied equally to all employees. He argues that the difference in the discipline that he and Collins received was based on discriminatory animus. There is no evidence, however, that refutes Capital Contractors's explanation that the

different punishments were simply based on the employees' different conduct and its determination that Collins's conduct did not rise to a level warranting termination. Furthermore, Collins was a foreman, whose position and whose knowledge of the company Capital Contractors's management took into account in deciding how to discipline him.

We conclude that Ryan has not met his burden of demonstrating pretext at the summary judgment stage. Ryan and Collins held different positions at Capital Contractors and engaged in different levels of physical aggression in their altercation. There is no evidence that shows that the difference in consequences for Ryan and Collins was a result of anything except their different conduct and different roles in the company. We do not say that the decision to terminate Ryan while retaining Collins was right or fair, only that it does not present an actionable case of intentional discrimination under the ADA.

B. Hostile Work Environment

To prevail on a hostile work environment claim under the ADA, Ryan must show "that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment." Shaver v. Indep. Stave Co., 350 F.3d 716, 720 (8th Cir. 2003) (citing Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 907-08 (8th Cir. 2003)). When the alleged harasser is the plaintiff's fellow employee there is a fifth element: that the employer knew or should have known of the harassment and failed to take proper action. See Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000). This element does not apply to allegations of supervisory harassment. Id. at n.5.

We have adopted a narrow definition of the term "supervisor" for purposes of determining whether a company is vicariously liable for a hostile work environment. To be considered a supervisor in the context of this claim, "the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." Wyers v. Lear Operations Corp., 359 F.3d 1049, 1057 (8th Cir. 2004) (quoting Joens v. John Morrell & Co., 354 F.3d 938, 940 (8th Cir. 2004)). Collins did not have this type of authority, and we must determine whether Capital Contractors knew or should have known of the harassment here.

It is not clear that the conduct at issue was "unwelcome" in the sense required in hostile work environment claims. "The proper inquiry is whether [Ryan] indicated by [his] conduct that the alleged harassment was unwelcome." Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 966 (8th Cir. 1999) (quoting Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1378 (8th Cir. 1996)). In Scusa, we upheld a grant of summary judgment where the plaintiff yelled and swore at her co-workers in the same manner that she claimed constituted harassment. Id. We assume, for purposes of summary judgment, that Ryan was offended by Collins's conduct and repeatedly asked him to stop. But Ryan, like the plaintiff-appellant in Scusa, "engaged in behavior similar to that which [he] claimed was unwelcome and offensive." See id. Ryan's behavior failed to send a consistent signal that Collins's conduct was unwelcome.

Even if Collins's conduct constituted unwelcome harassment, it did not affect the terms, conditions, or privileges of Ryan's employment. We construe the phrase "terms, conditions, or privileges of employment" with reference to our Title VII jurisprudence. See Shaver, 350 F.3d at 720. "[W]e have repeatedly emphasized that anti-discrimination laws do not create a general civility code." Id. at 721 (citing Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 327 F.3d 771, 782 (8th Cir. 2003)). A hostile work environment must be both subjectively and objectively offensive, as well as "extreme in nature and not merely rude or unpleasant."

Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 751 (8th Cir. 2009) (citations omitted). "In determining whether a plaintiff has demonstrated a hostile work environment, we consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's job performance." Cross v. Prairie Meadows Racetrack & Casino, Inc., 615 F.3d 977, 981 (8th Cir. 2010).

Collins's conduct in this case did not reach the level of creating a hostile work environment. Ryan was able to perform his duties at work and did everything that was required of him despite Collins's conduct. See, e.g., Cross, 615 F.3d at 982; Stuart v. Gen. Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000) (holding that plaintiffs were unable to demonstrate a hostile work environment, partly because they were able to perform their duties at work unimpeded by the harassment). In considering the totality of the circumstances, Collins's behavior was undoubtedly inappropriate and likely subjectively offensive. But given the atmosphere of the workplace, Ryan's participation in similar conduct, and Ryan's continued ability to perform his duties, it did not rise to the level of extreme behavior that is objectively offensive.

Finally, Ryan has failed to present evidence that Capital Contractors knew or should have known of this harassment and failed to address it.[4] It is undisputed that Collins did not call Ryan names and engage in horseplay when members of management were present. It is also undisputed that Ryan never complained to anyone other than Collins about Collins's conduct. "An employee has a duty to take reasonable steps to prevent harassment and mitigate harm." Cross, 615 F.3d at 983 (citing Faragher, 524 U.S. at 806-07). Ryan had worked with production

---

[4]Ryan argues that Capital Contractors did not have an equal employment opportunity policy in effect at the time of the incident, and so is unable to utilize the affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775, 807-808 (1998). Because Capital Contractors has not attempted to invoke any such affirmative defense, see Appellee's Br. at 38, we do not address the argument.

superintendent Borrell for most of the past thirty years, and he also demonstrated that he knew to contact owner Sidles when he wanted his job back. He could have complained of Collins's conduct to either Borrell or Sidles when Collins was not responsive to Ryan's requests that he cease engaging in such conduct.

We conclude that Ryan failed as a matter of law to demonstrate the elements necessary to establish a hostile work environment claim.

III.

The judgment is affirmed.

_____